945 So.2d 1009 (2006)
Charles D. HOLCOMB, individually and as administrator of the estate of Carolyn Holcomb
v.
Robert P. CARRAWAY, M.D., et al.
1041471.
Supreme Court of Alabama.
April 21, 2006.
Rehearing Denied June 23, 2006.
*1010 Charles A. Dauphin and Joseph D. Jackson, Jr., of Baxley, Dillard, Dauphin, McKnight & Barclift, Birmingham, for appellant.
Joseph L. Reese, Jr., and Randal H. Sellers of Starnes & Atchison, LLP, Birmingham, for appellee Robert P. Carraway, M.D.
Robert E. Cooper, Deborah Alley Smith, and Jennifer M. Thompson of Christian & Small, LLP, Birmingham, for appellees H. Chaney Aderholt, M.D., Randy Finley, M.D., and Steven Manzi, M.D.
STUART, Justice.
Charles D. Holcomb, individually and in his capacity as the administrator of the estate of Carolyn Holcomb, appeals from summary judgments entered in favor of Dr. Robert P. Carraway, Dr. H. Chaney Aderholt, Dr. Randy Finley, and Dr. Steven Manzi. We affirm.

Facts
This is a medical-malpractice action. Because Holcomb is the nonmovant, we construe all disputed facts in his favor. In 1984, Carolyn Holcomb became a patient of Dr. Carraway, a board-certified general surgeon. Carolyn, who had a family history of breast cancer, was first referred to Dr. Carraway in 1984 for surgical evaluation of a palpable cyst on her left breast. Dr. Carraway performed an aspiration of the cyst and determined that the cyst was benign but that it contained atypical cells. Dr. Carraway diagnosed Carolyn as having fibrocystic breast disease, also referred to as "dysplasia," which, according to Dr. Carraway, can create breast "nodularity" and fullness. Carolyn then began seeing Dr. Carraway regularly to monitor her fibrocystic breast disease.
In the years following her diagnosis, Carolyn had several cysts come and go, and, at various times, she complained of fullness, pain, and tenderness in her breasts. Carolyn regularly underwent mammograms, which were read and the results reported to Dr. Carraway by various radiologists. The radiology reports frequently indicated that Carolyn's films were difficult to evaluate. Carolyn also underwent mammograms at least once a year, sometimes every six months, and sometimes more frequently. Those mammograms were read by Dr. Aderholt, Dr. Finley, or Dr. Manzi (hereinafter referred to collectively as "the defendant radiologists").
On June 30, 1997, Dr. Carraway examined Carolyn and requested a mammogram. Dr. Aderholt interpreted the X-ray *1011 and reported to Dr. Carraway that there were "no significant interim changes" from Carolyn's previous examinations. On June 4, 1998, Dr. Aderholt interpreted another mammogram film and reported that the film indicated a "questionable new density with possible spiculated edges."[1]
Dr. Carraway received this June 4, 1998, report from Dr. Aderholt. However, he could not locate a physical mass during his physical examination of Carolyn. Dr. Aderholt's report also indicated that no physical mass could be located. Dr. Carraway testified that he could not perform an aspiration or a biopsy unless a mass could be located. Therefore, he performed neither of those procedures at that time.
In December 1998, Dr. Carraway and Dr. Aderholt again saw Carolyn. She was complaining of pain and stinging in the area of her left breast. A mammogram was performed and Dr. Aderholt's interpretation of the mammogram indicated that the "previously noted opacity is less apparent. . . . Six month study advised." Dr. Carraway did not perform a biopsy or an aspiration during or as a result of the December 1998 visit.
In June 1999, Dr. Carraway again examined Carolyn. She again was complaining of pain in the same area. After a mammogram was performed, Dr. Manzi interpreted the films; in his report he stated "[n]o mammographic evidence of malignancy. Recommend bilateral study in 1 year." Dr. Carraway did not perform a biopsy.
On October 27, 1999, Carolyn reported pain, thickening, and the presence of a lump in her left breast. The next day, a mammogram was performed. Dr. Aderholt read it and saw "multiple benign appearing cysts." Dr. Aderholt ordered a repeat mammogram. On his interpretative report of this second mammogram, he indicated "[m]ultiple rounded lesions seen to be cystic in nature on ultrasound. Repeat ultrasound study advised in 3 months time." Dr. Carraway did not perform a biopsy.
In December 1999, Carolyn suffered an unrelated injury that caused pain in her hip. She consulted an orthopedist about the pain. During this examination and following workup, the orthopedist identified a lesion on Carolyn's right femur. Upon learning of this lesion, Carolyn informed her orthopedist of the lump in her left breast. Carolyn underwent another mammogram; Dr. Finley interpreted this mammogram. He indicated that the area of concern was a "probably benign finding."
On January 19, 2000, Carolyn underwent biopsies of her leg and her left breast. The following day, she was diagnosed with cancer. Carolyn began extensive treatment for her cancer.
On October 30, 2000, Carolyn Holcomb and Charles D. Holcomb sued Dr. Carraway, Dr. Aderholt, Dr. Finley, and Dr. Manzi. Carolyn Holcomb alleged that the defendants negligently failed to detect and diagnose her breast cancer in a timely manner. Charles Holcomb alleged a loss of consortium as a result of the defendants' negligence. All of the defendants filed motions for a summary judgment. Carolyn died on January 17, 2005, as a result of her cancer, and Charles was named as the administrator of her estate.
In March and April 2005, the trial court heard arguments on the summary-judgment motions. On May 11, 2005, the trial court held that no genuine issues of material fact existed, and it entered summary *1012 judgments in favor of all defendants. The trial court did not specify reasons for its holding.
On June 17, 2005, 37 days after the entry of the summary judgments, Charles Holcomb filed a motion to substitute Carolyn's estate as a plaintiff in place of Carolyn.[2] On June 21, 2005, the trial court granted this motion; this motion was granted on the same date the notice of appeal was filed.
On appeal, Holcomb raises the following issues:
"I. Whether the trial court erred in holding that Holcombs' expert, Dr. Murray Bern, a board certified oncologist, was not competent to testify against Carraway, a general surgeon, regarding the negligent failure to detect or diagnose breast cancer, when no surgical procedure was performed.
"II. Whether the trial court erred in holding there was no genuine issue of material fact as to whether there was a breach of the standard of care by Carraway in the failure to detect or diagnose breast cancer in Carolyn Holcomb.
"III. Whether the trial court erred in holding that Holcombs' radiology expert, Dr. Karl Dockray, was not a `similarly situated health care provider,' under the Alabama Medical Liability Act because he was not actively certified under the Mammogram Quality Standards Act (MQSA).
"IV. Whether the trial court erred in holding there is no genuine issue of material fact as to whether there was a breach of the standard of care by Aderholt, Manzi, and Finley in the failure to detect or diagnose breast cancer on the breast imaging mammograms of Carolyn Holcomb."

Standard of Review
"In determining whether the summary judgment was properly entered, the reviewing court must view the evidence in a light most favorable to the nonmovant. Rule 56[, Ala. R. Civ. P.,] is read in conjunction with the `substantial evidence rule' (§ 12-21-12, Ala.Code 1975), for actions filed after June 11, 1987. In order to defeat a properly supported motion for summary judgment, the plaintiff must present `substantial evidence,' i.e., `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'"
Rodgers v. Adams, 657 So.2d 838, 839-40 (Ala.1995) (citations omitted).

Applicable Law
The plaintiff in a medical-malpractice action must prove by substantial evidence that the defendant health-care provider "failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case." § 6-5-548(a), Ala. Code 1975. To meet this burden, a plaintiff ordinarily must present expert medical testimony; however such expert testimony is allowed only from a "similarly situated health care provider." See § 6-5-548(e), Ala.Code 1975; Leonard v. Providence Hosp., 590 So.2d 906 (Ala.1991).
Section 6-5-548, a provision of the Alabama Medical Liability Act, § 6-5-504 et seq., Ala.Code 1975 ("the AMLA"), provides two definitions of a "similarly situated *1013 health care provider," depending upon whether the defendant health-care provider is a "specialist" or a "nonspecialist." See § 6-5-548(b) and (c), Ala.Code 1975. If the defendant is a nonspecialist, § 6-5-548(b) defines a "similarly situated health care provider" as one who meets all of the following qualifications:
"(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
"(2) Is trained and experienced in the same discipline or school of practice.
"(3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred."
If the defendant is a specialist, subsection (c) defines a "similarly situated health care provider" as one who meets all of the following qualifications:
"(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
"(2) Is trained and experienced in the same specialty.
"(3) Is certified by an appropriate American board in the same specialty.
"(4) Has practiced in this specialty during the year preceding the date that the alleged breach of the standard of care occurred."
§ 6-5-548, Ala.Code 1975. In 1996, the legislature further addressed the circumstances under which an expert witness may qualify as a similarly situated health-care provider by amending § 6-5-548(e) to provide:
"(e) The purpose of this section is to establish a relative standard of care for health care providers. A health care provider may testify as an expert witness in any action for injury or damages against another health care provider based on a breach of the standard of care only if he or she is a `similarly situated health care provider' as defined above. It is the intent of the Legislature that in the event the defendant health care provider is certified by an appropriate American board or in a particular speciality and is practicing that specialty at the time of the alleged breach of the standard of care, a health care provider may testify as an expert witness with respect to an alleged breach of the standard of care in any action for injury, damages, or wrongful death against another health care provider only if he or she is certified by the same American board in the same specialty."
Thus, to determine whether subsection (b) or (c) is applicable to a plaintiff's proffered expert, we must determine whether the defendant health-care provider qualifies as a "specialist."
In order to determine whether the defendant health-care provider qualifies as a specialist, we must first determine the field of medical practice in which the negligence is alleged to have occurred. If the defendant health-care provider is a specialist in the field of practice in which the alleged negligence occurred, then the proffered expert witness must also be a specialist in that field, under § 6-5-548(c), Ala.Code 1975. See also Medlin v. Crosby, 583 So.2d 1290, 1293 (Ala.1991).
I. Whether Dr. Murray Bern was a "similarly situated health care provider" to Dr. Carraway.
In his complaint, Holcomb alleges that Dr. Carraway is a surgeon, that he had treated Carolyn since the early 1980s, and that under his care she underwent mammograms at least yearly and often *1014 more frequently.[3] Holcomb further alleges:
"14. Defendant Carraway owed [the Holcombs] a duty to exercise such reasonable care, skill and diligence as surgeons in the medical community ordinarily have and exercise in like cases.
"15. Defendant Carraway breached that duty by negligently and/or wantonly:
"a. failing to detect Mrs. Holcomb's breast cancer;
"b. failing to perform further tests to detect Mrs. Holcomb's breast cancer; [and]
"c. failing to advise [the Holcombs] that Mrs. Holcomb should have such tests."
(Emphasis added.)
Thus, in general, Holcomb alleges that Dr. Carraway acted negligently in failing to diagnose or discover Carolyn's breast cancer. However, more specifically, Dr. Carraway is alleged to have negligently failed to perform a biopsy on Carolyn's breasts at the proper time.
A "biopsy" is a surgical procedure. Therefore, Holcomb's complaint charges Dr. Carraway with failing to perform a necessary surgical procedure on Carolyn in June 1998. Additionally, Holcomb specifically alleges that Dr. Carraway breached the standard of care as it pertains to the exercise of his judgment as a surgeon.
Dr. Carraway is certified by the American Board of Surgery as a specialist in general surgery. Dr. Carraway testified that in his treatment of Carolyn Holcomb he was practicing his specialty of general surgery. Based on Holcomb's allegations and on Dr. Carraway's testimony, we conclude that Dr. Carraway was a specialist and that he was engaged in the practice of his specialty of general surgery at the time of the alleged breach of the applicable standard of care. Therefore, § 6-5-548(c), Ala.Code 1975, is applicable to Dr. Carraway.
However, Dr. Bern, the expert witness Holcomb proffered against Dr. Carraway, does not meet the requirements of § 6-5-548(c). Dr. Bern is not board-certified in general surgery; he is board-certified in internal medicine, hematology, and medical oncology. In his practice as an oncologist, Dr. Bern treats patients who have already been identified as having cancer; it is not a normal function of his medical practice to make the initial diagnosis of cancer.[4] Moreover, he performs no breast biopsies in his practice. Finally, Dr. Bern testified that he conducts breast examinations on female patients who are in his office for treatment of a cancer (whether breast cancer or other type of cancer), for treatment of a hematological-related condition (coagulation disorders, bone-marrow diseases, etc.), or for general follow-up care after having received treatment for one of the above-identified problems. However, if as a result of Dr. Bern's examination he wanted a biopsy performed, he would refer the patient to a surgeon or a radiologist trained to perform biopsies.
*1015 Because Dr. Carraway was practicing in the field of general surgery when the alleged breach occurred, because Holcomb alleges in his complaint that Dr. Carraway breached the standard of care applicable to surgeons, and because Dr. Bern is not a board-certified surgeon, we conclude that Dr. Bern is not a "similarly situated health care provider" under § 6-5-548(c), Ala. Code 1975. We conclude that, under the AMLA, he was not qualified to offer expert testimony against Dr. Carraway in this case.
As to Dr. Carraway, Holcomb offered no other similarly situated health-care provider to testify as to the standard of care and to establish that a breach of that standard of care occurred. Without expert testimony to establish that Dr. Carraway breached the applicable standard of care, Holcomb's case against Dr. Carraway fails as a matter of law. We do not know the basis of the trial court's summary judgment in favor of Dr. Carraway; however, for the reasons stated we affirm the trial court's judgment as to Dr. Carraway.
II. Whether the trial court erred in holding that Holcomb's radiology expert, Dr. Karl Dockray, was not competent to testify as an expert witness against the defendant radiologists.
The trial court granted the defendant radiologists' motion for a summary judgment without stating its reasons for doing so. For the reasons stated below, we affirm that summary judgment.
Holcomb proffered Dr. Karl Dockray as a similarly situated health-care provider to testify to the standard of care applicable to the defendant radiologists, Dr. Aderholt, Dr. Finley, and Dr. Manzi. The defendant radiologists are all board-certified radiologists who, at all times pertinent to this action, were reading mammograms in a nationally certified mammography facility. Holcomb alleges that the defendant radiologists failed to "detect or diagnose breast cancer on Carolyn Holcomb's mammograms from June 1998 forward." (Holcomb's brief, p. 27.) During his deposition, Dr. Dockray testified that the earliest breach by any of the defendant radiologists occurred in June 1997.[5] Regardless of which date was the date of the earliest alleged breach, it is undisputed that, at all times pertinent to this action, the defendant radiologists were working in the area of their specialtythe practice of radiology and, more specifically, reading and interpreting mammograms. Thus, in our consideration of the defendant radiologists, § 6-5-548(c), Ala.Code 1975, is also applicable, because they are specialists and were practicing their specialty at the time they allegedly breached the standard of care.
The parties do not dispute that Dr. Dockray meets the technical requirements of § 6-5-548(c), Ala.Code 1975, i.e., (1) he is a licensed medical physician; (2) he is trained and experienced in radiology; (3) *1016 he is certified by the same board as the defendant radiologiststhe American Board of Radiology; and (4) he had practiced radiology during the year preceding all of the alleged breaches by the defendant radiologists.
However, the defendant radiologists assert that the trial court properly excluded Dr. Dockray from serving as a "similarly situated health care provider" for other reasons. They point out that Dr. Dockray has not performed mammograms since 1994a three- or four-year period preceding the date of the earliest alleged breach, depending on which date is used to determine the earliest alleged breach.[6] They also point out that in addition to not performing mammograms for the three- or four-year period preceding the earliest alleged breach, federal law prohibited Dr. Dockray from interpreting mammograms during that time frame. The Mammogram Quality Standards Act ("the MQSA"), 42 U.S.C. § 263b et seq., effective October 1994, applies to all facilities performing mammograms and requires that all radiologists who interpret mammograms for such a facility must meet the requirements of the MQSA. It is undisputed that Dr. Dockray does not meet those requirements.
Therefore, the defendant radiologists argue, Dr. Dockray could not have been familiar with the standard of care applicable to a radiologist performing mammograms during the 12-month period preceding their alleged breaches. The defendant radiologists also argue that, because Dr. Dockray had not performed mammograms during the three or four years preceding their alleged breaches and could not have been familiar with the standard of care applicable to that practice, he is no longer in the "same general line of practice" as the defendant radiologists, as required under § 6-5-548(a), Ala.Code 1975 ("In any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case.").
Further, the defendant radiologists argue that the enactment of the AMLA did not displace the applicability of the Alabama Rules of Evidence and the broad discretion granted the trial court under those Rules (see, e.g., Rule 702, Ala. R. Evid., and the Advisory Committee's Notes to Rule 702)[7] to determine when a *1017 witness is qualified to provide expert testimony. They argue that, although Dr. Dockray met the technical requirements of § 6-5-548(c), Ala.Code 1975, for the reasons identified above the trial court did not exceed its discretion in excluding Dr. Dockray's testimony.
This Court has previously considered similar issues. In Biggers v. Johnson, 659 So.2d 108 (Ala.1995), this Court recognized the trial court's continuing discretion in applying § 6-5-548, Ala.Code 1975, to issues involving expert testimony. In Biggers, the trial court recognized that whether the proffered expert witness in a medical-malpractice action met the requirements of a "similarly situated health care provider," as that term is defined in § 6-5-548(b), Ala.Code 1975, was a "`very, very, very close question.'" 659 So.2d at 109. The trial court resolved the question in favor of admitting the testimony of the expert witness. On appeal, this Court agreed that the question was a "close one" and stated "we cannot say that the trial judge abused his discretion in allowing Dr. Nelson to testify as an expert." 659 So.2d at 112. Thus, the Court in Biggers recognized that, in determining whether a proffered witness was qualified to testify as an expert in a medical-malpractice action, under § 6-5-548, Ala.Code 1975, the discretion granted to a trial court under the Alabama Rules of Evidence continued to apply.
Although the issue presented in Biggers was similar to the issue before the Court today, it was not identical. In Biggers, the trial court used its discretion in deciding a close question of whether the proffered expert met the requirements of § 6-5-548(b). In this case, it is undisputed that Dr. Dockray met the requirements of § 6-5-548(c), Ala.Code 1975. Thus, we are asked to determine whether the trial court has the discretion to exclude a witness's testimony although the witness meets all of the requirements of § 6-5-548(b) or (c).
Even more on point than Biggers is the case of Martin v. Dyas, 896 So.2d 436 (Ala.2004). In Martin, the plaintiff in a medical-malpractice action presented as a proffered expert a physician who met all of the requirements set forth in § 6-5-548(c). The defendants objected because the proffered expert, although meeting the criteria set forth in § 6-5-548(c), did not satisfy the test established in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The trial court granted the defendant's motion to exclude the plaintiff's proffered expert.
On appeal, the plaintiff argued that, if a proffered expert meets the requirements of § 6-5-548, Ala.Code 1975, the trial court has no discretion to exclude that witness's testimony. The defendant argued that the requirements set forth in § 6-5-548 were "a bare minimum and that a trial court may still act within its discretion to exclude expert-witness testimony based on other factors, including Rule 702, Ala. R. Evid., and Daubert. The [defendant] further asks us formally to adopt Daubert as the law in Alabama." 896 So.2d at 440.
In reversing the trial court's ruling, the Court in Martin v. Dyas stated:
"[I]t is unnecessary in the present case for this Court to reach the extreme results urged by the parties. . . .
". . . .
"[The proffered expert witness] was qualified to testify as an expert witness pursuant to any of the standards advanced by the parties. Therefore, the trial court exceeded its discretion in excluding *1018 his testimony, and the trial court's order in that regard was in error."
896 So.2d at 441. Thus, the same issue raised in this case was presented in Martin; however, we did not find that case an appropriate one in which to specifically address the discretion afforded to a trial court when determining whether a proffered witness who meets the requirements of § 6-5-548 is qualified to testify as an expert in a medical-malpractice action. We now find the issue squarely before us.
In determining the meaning of a statute, we must begin by analyzing the language of the statute itself:
"This Court has held that the fundamental rule of statutory construction is to ascertain and give effect to the intent of the Legislature in enacting a statute. If possible, a court should gather the legislative intent from the language of the statute itself. If the statute is ambiguous or uncertain, the court may consider conditions that might arise under the provisions of the statute and examine results that would flow from giving the language in question one particular meaning rather than another. The legislative intent may be gleaned from the language used, the reason and necessity for the act, and the purpose sought to be obtained by its passage."
Norfolk Southern Ry. v. Johnson, 740 So.2d 392, 396 (Ala.1999) (citations omitted).
We find nothing in § 6-5-548, Ala.Code 1975, to indicate that, by setting forth requirements that must be met before a physician may testify as a "similarly situated health care provider," the legislature intended to abrogate the Alabama Rules of Evidence. The language of § 6-5-548 does not mandate that, once the credentials established in that statute are met, the proffered expert must be allowed to testify.
Section 6-5-548(b), (c), and (d) each begin with the introductory phrase "[n]otwithstanding any provision of the Alabama Rules of Evidence to the contrary. . . ." We read the introductory phrase "[n]otwithstanding any provision of the Alabama Rules of Evidence to the contrary" to mean that, regardless of the other criteria set forth in the Alabama Rules of Evidence that may be used to determine the admissibility of opinion testimony, in order to testify as to the standard of care applicable to a defendant health-care provider, the proffered expert witness must first meet the requirements of a "similarly situated health care provider," as established in § 6-5-548(b) and (c).[8] If those requirements are not met, the statutory requirements to testify as an expert witness in a medical-malpractice action have not been met, and the proffered witness clearly cannot be allowed to testify.
The converse, however, is not necessarily true. Nothing in § 6-5-548(b) and (c) or in the remainder of § 6-5-548 provides that once a witness has met the criteria stated in subsection (b) or (c) the trial court may not consider other factors in determining whether to allow the proffered expert testimony.
Additionally, the legislature's use of permissive language as opposed to mandatory language in § 6-5-548, Ala.Code 1975, does nothing to compel a different conclusion. See Ex parte Prudential Insurance Co. of America, 721 So.2d 1135, 1138 (Ala. 1998), in which this Court stated:
"The word `shall' has been defined as follows:

*1019 "`As used in statutes, contracts, or the like, this word is generally imperative or mandatory. In common or ordinary parlance, and in its ordinary signification, the term "shall" is a word of command, and one which has always [been] or which must be given a compulsory meaning; as denoting obligation. The word in ordinary usage means "must" and is inconsistent with a concept of discretion.'"
(Quoting Black's Law Dictionary 1375 (6th ed.1991).) See also State ex rel. Hartman v. Thompson, 627 So.2d 966, 970 (Ala.Civ. App.1993) ("Moreover, had the legislature intended for service as a holdover to be a mandatory part of the statutory term of office, it would not have used the permissive term `may,' but would have used the imperative term `shall,' as it did elsewhere in § 5-2A-3.").
In § 6-5-548, the imperative term "shall" appears only three times and is not used in conjunction with the duty of the trial court to admit expert testimony. For example, § 6-5-548(a) mandates that "[i]n any action . . . against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving . . . that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case." (Emphasis added.) This language addresses the plaintiff's burden; it does not address the trial court's obligation as it applies to the admission of expert testimony.
The mandatory term "shall" appears again in § 6-5-548(d), which addresses the admissibility of evidence pertaining to medical-liability insurance. This subsection provides:
"Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, no evidence shall be admitted or received . . . concerning the medical liability insurance, or medical insurance carrier. . . . The limits of liability insurance coverage available to a health care provider shall not be discoverable. . . . "
(Emphasis added.) This subsection obviously does not address whether the trial court must or "shall" admit testimony from a witness who meets the requirements set forth in any other subsection of the AMLA. The term "shall" does not appear elsewhere in § 6-5-548, Ala.Code 1975.
The legislature's use of the permissive term "may" in § 6-5-548(e), Ala.Code 1975, which does address the admissibility of expert testimony in a medical-malpractice action, is also highly instructive. That subsection provides:
"(e) The purpose of this section is to establish a relative standard of care for health care providers. A health care provider may testify as an expert witness . . . against another health care provider based on a breach of the standard of care only if he or she is a `similarly situated health care provider' as defined above. It is the intent of the Legislature that in the event the defendant health care provider is certified by an appropriate American board or in a particular specialty and is practicing that specialty at the time of the alleged breach of the standard of care, a health care provider may testify as an expert witness with respect to an alleged breach of the standard of care . . . against another health care provider only if he or she is certified by the same American board in the same specialty."
(Emphasis added.) Had the legislature wanted to mandate that the trial court admit the testimony of a proffered expert who met the requirements of § 6-5-548(b) or (c), it could have easily done so. It could have stated such an intention by *1020 changing the phrase "may testify" to "shall be allowed to testify" or some other similar mandatory language. However, in § 6-5-548(e), the legislature chose not to use such mandatory words and phrases.
However, the fact that the legislature used "shall" in § 6-5-548(a) and § 6-5-548(d), Ala.Code 1975, illustrates that in enacting the AMLA the legislature clearly understood the mechanism by which to mandate certain actions and the mechanism by which to prohibit absolutely other actions; the use of "shall" in those two subsections also indicates that the legislature made a distinction between mandatory and permissive actions.
Our application of another principle of statutory construction further supports the conclusion that the legislature did not intend in enacting § 6-5-548(b) and (c) to abrogate the trial court's discretion in matters of admitting expert testimony.
"It is an ingrained principle of statutory construction that `[t]he Legislature is presumed to be aware of existing law and judicial interpretation when it adopts a statute. Ex parte Louisville & N.R.R., 398 So.2d 291, 296 (Ala.1981).' Carson v. City of Prichard, 709 So.2d 1199, 1206 (Ala.1998). `"It is a settled rule that in the adoption of the Code the Legislature is presumed to have known the fixed judicial construction pre-existing statutes had received, and the substantial re-enactment of such statutes is a legislative adoption of that construction."' Wood-Dickerson Supply Co. v. Cocciola, 153 Ala. 555, 557, 45 So. 192, 192 (1907) (quoting Morrison v. Stevenson, 69 Ala. 448, 450 (1881)). `It is a familiar principle of statutory interpretation that the Legislature, in enacting new legislation, is presumed to know the existing law.' Blue Cross & Blue Shield of Alabama, Inc. v. Nielsen, 714 So.2d 293, 297 (Ala.1998)."
Ex parte Fontaine Trailer Co., 854 So.2d 71, 83 (Ala.2003). When it enacted the AMLA and, more specifically, § 6-5-548, the legislature was well aware of the long-standing and widely recognized discretion granted a trial court pursuant to Rule 702, Ala. R. Evid., in determining the admissibility of expert testimony. Because the legislature elected not to specifically abrogate the applicability of that rule in medical-malpractice actions and did not specifically mandate that the trial court had no choice but to admit the testimony of a witness who meets the requirements of § 6-5-548(b) or (c), we will not read such a result into the statute.
Based on the foregoing, we conclude that, in a medical-malpractice action, the Alabama Rules of Evidence continue to apply to the trial court's determination of who is allowed to testify as an expert witness. Even when the proffered expert witness meets the requirements of a "similarly situated health care provider," as that term has been defined in § 6-5-548(b) and (c), a trial court retains the discretion provided in Rule 702, Ala. R. Evid., to determine whether a witness's testimony will assist the trier of fact. Stated differently, the credentials set forth in § 6-5-548(b) and § 6-5-548(c) establish the threshold showing, rather than the only showing, that must be met before an expert witness may testify against a health-care provider as to an alleged breach of the standard of care. As with other such rulings, a trial court's determination in this regard is subject to reversal in the event the trial court exceeds its discretion.
In this case, we find that the trial court did not exceed its discretion in refusing to allow Dr. Dockray to testify as an expert witness as to the alleged breaches of the standard of care by the defendant radiologists. Although the trial court did not state its reasons for excluding Dr. Dockray's *1021 testimony, the trial court could have determined that, because Dr. Dockray had not performed mammograms for at least three years preceding the earliest alleged breach, his testimony would not assist the trier of fact. For that same reason, the trial court could also have concluded that Dr. Dockray was not familiar with the "care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case." § 6-5-548(a), Ala. Code 1975. We cannot conclude that the trial court exceeded its discretion in excluding Dr. Dockray's testimony.
Other than Dr. Dockray, Holcomb produced no witness to establish that the defendant radiologists breached the standard of care. Therefore, the defendant radiologists were entitled to summary judgments as a matter of law. We affirm the summary judgments entered in their favor.

Conclusion
Because of our resolution of these issues relating to the proffered testimony of the expert witnesses, we need not address the other issues raised on appeal. We affirm the summary judgment entered for Dr. Carraway; we also affirm the summary judgments entered for Dr. Aderholt, Dr. Finley, and Dr. Manzi.
AFFIRMED.
NABERS, C.J., and SEE, HARWOOD, SMITH, and BOLIN, JJ., concur specially.
LYONS, WOODALL, and PARKER, JJ., concur in part and dissent in part.
SEE, Justice (concurring specially).
I concur fully in the main opinion and in Justice Harwood's special concurrence. I write specially to explain my understanding of the structure of § 6-5-548, Ala.Code 1975, a provision of the Alabama Medical Liability Act.
Subsection (a) of § 6-5-548 states that in an action against a health-care provider alleging a breach of the standard of care, the plaintiff has the burden to prove that the health-care provider failed to exercise "such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case."[9] Thus, the applicable standard of care is that of other "similarly situated health care providers."
Subsections (b) and (c) define who is a "similarly situated health care provider."[10] *1022 Anyone who meets the criteria of § 6-5-548(b) or (c) is a "similarly situated health care provider"; anyone who does not meet those criteria is not.[11] However, subsections (b) and (c) do not by their terms define who may testify as an expert witness in a medical-malpractice action; subsection (e) addresses that question. Section 6-5-548(e) provides that one "may" testify as an expert witness as to a "breach of the standard of care" "only if" he or she is a "similarly situated health care provider," that is, only if he or she meets the criteria set forth in § 6-5-548(b) or § 6-5-548(c).[12]
The term "may" indicates that someone has the option of doing or allowing some action or of not doing or allowing some action. See Black's Law Dictionary 1000 (8th ed.2004) ("[t]o be permitted to[;] [t]o be a possibility. . . ."). Thus, the question is who makes the decision whether to allow the expert in a medical-malpractice action to testify: the trial court or the party proffering the expert?
Section 6-5-548(e) provides that the expert may testify "only if" he or she is a "similarly situated health care provider"; it does not state that the expert may testify "if" he or she is a "similarly situated health care provider." "If" is a term of sufficiency. For example, the customer will accept the shipment "if" it has a moisture content of less than 4%; the team will clinch the pennant "if" it wins this game. There may be other ways to get the shipment accepted, perhaps, for example, by lowering the price. There may be other ways for the team to clinch the pennant, perhaps by winning not this game but the next. The alternative ways to have the shipment accepted or to clinch the pennant are unnecessary, however, "if" the shipment has a moisture content of less than *1023 4% or "if" the team wins this game. The presence of condition A is sufficient to produce consequence B. There may be alternative ways to produce B, but if condition A is met, there are no additional conditions that remain to be met in order to produce consequence B.
The term "only if," on the other hand, is a term, not of sufficiency, but of necessity. For example, the shipment will be accepted "only if" it has a moisture content of less than 4%; the team will clinch the pennant "only if" it wins this game. This describes a condition of necessity, not one of sufficiency. Thus, there may be other conditions on the acceptance of the shipment,[13] but even if all of those other conditions are met, and more, the shipment will be accepted "only if" the moisture content is less than 4%. There may be other games that the team must win,[14] but even if it wins all those other games, the team will clinch the pennant "only if" it wins this game. The fulfillment of condition A is necessary to produce consequence B, although it alone may not be sufficient there may be other, additional conditions that also must be met.[15]
Thus, under § 6-5-548, Ala.Code 1975, a part of the Alabama Medical Liability Act, an individual may not testify unless he meets the conditions specified in subsection (b) or in subsection (c); however, it is not sufficient that he has met those requirementsthere may be other conditions on the testimony as well. Had the legislature provided that the witness "may testify if he is a similarly situated health care provider," then satisfying the requirements of § 6-5-548(b) or (c) would have been all that is required for the witness in a medical-malpractice action to testify as an expert. Determining whether the expert would testify would lie, not with the trial court, but with the party offering the expert. However, the legislature did not say "if"; it provided that the expert "may testify only if he is a similarly situated health care provider." Thus, it is a necessary condition that the expert meet the requirements of subsection (b) or (c), whichever is applicable; otherwise, the expert does not qualify to testify, regardless of what other criteria he or she meets. In addition to the requirements of subsections (b) and (c), there may be other, additional conditions that must be met for the expert to be permitted to testify, notably, compliance with the Alabama Rules of Evidence. The determination whether the expert may in fact testify thus lies with the trial court, constrained by law.
The foregoing understanding of § 6-5-548(e)that the "similarly situated health care provider" requirement is a necessary condition instead of a sufficient condition to the testimony of a proffered expert in a medical-malpractice caseis a reasonable reading of that section. The alternative readingthat compliance with subsection (b) or with subsection (c) is sufficient to entitle the expert witness to testify, notwithstanding any rule of evidence to the *1024 contrarywould lead to absurd results. If § 6-5-548(e) meant that there are no conditions on allowing expert testimony beyond the condition that the proffered expert satisfy subsection (b) or subsection (c), then the trial court would be precluded from applying the Alabama Rules of Evidence to exclude the testimony of an expert witness who met the criteria of § 6-5-548(b) or (c).[16]
Rule 403, Ala. R. Evid., allows the preclusion of a witness because the witness's testimony would be cumulative and a waste of the court's time.[17] Yet an interpretation of § 6-5-548(e) that says that any expert who qualifies under § 6-5-548(b) or (c) may testify without meeting any additional conditions would deny the trial court the right to invoke Rule 403, even if the proffered expert were the third, or fourth, or twelfth witness offered on the issue, or if the expert's testimony would be irrelevant, prejudicial, or misleading and therefore offer nothing of value to the jury.
Rule 603, Ala. R. Evid., provides: "Before testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so." Surely, § 6-5-548(e) does not relieve the expert witness of the obligation to declare, either by oath or affirmation, that he or she will testify truthfully.[18]
I conclude, for the reasons stated above, that the language of the statute provides minimum necessary conditions a proffered expert witness in a medical-malpractice case must satisfy in order to testify. I also conclude that to construe the statute otherwise not only would violate the letter of the statute, but also would lead to absurd results.
HARWOOD, Justice (concurring specially).
I concur fully in all aspects of the main opinion; I write specially only to discuss further the conclusion expressed in the penultimate paragraph before the "conclusion" of the opinion, that "because Dr. Dockray had not performed mammograms" for several years preceding the alleged misreadings of Carolyn Holcomb's mammograms by the defendant radiologists, *1025 it was within the discretion accorded the trial judge by Rule 702, Ala. R. Evid., to exclude his testimony, even though Dr. Dockray qualified as a similarly situated health-care provider under § 6-5-548(c), Ala.Code 1975. Technically, what is at issue here is not the "performance" of a mammogram, but rather the interpretation or "reading" of the resulting image.
Holcomb argues in brief that the Mammogram Quality Standards Act ("the MQSA") "is merely a quality assurance statute for hospitals and medical facilities" and that its enactment did not cause "board certified diagnostic radiologists in those facilities, who read and interpreted thousands of mammograms over the course of years, [to] become any less qualified." I do not agree that the MQSA is a quality-assurance statute only for hospitals and medical facilities, and, although I agree that board-certified diagnostic radiologists did not become any less qualified immediately upon the enactment of the MQSA, I believe their qualifications with regard to the specialized area of interpreting mammograms would have subsequently begun to suffer when they were disqualified from performing clinical mammogram interpretations.
Under the MQSA, "[t]he term `facility' means a hospital, outpatient department, clinic, radiology practice, or mobile unit, an office of a physician, or other facility as determined by the Secretary, that conducts breast cancer screen or diagnosis through mammography activities." 42 U.S.C. § 263b(a)(3)(A). The activities of a facility governed by the MQSA include "the initial interpretation of the mammogram" and, when "the interpretation of the mammogram [is] performed in a location different from where the mammogram is performed, the facility performing the mammogram shall be responsible for meeting the quality standards described in subsection (f) of this section." 42 U.S.C. § 263b(a)(3)(B). In order to be certified, a facility must "provide for the interpretation of a mammogram produced by . . . equipment at the facility or under arrangements with a qualified individual at a facility different from where the mammography examination is performed." 42 U.S.C. § 263b(b)(2)(B).
Under the aforesaid "subsection (f)," standards established by the Secretary include those that require establishment and maintenance of a quality-assurance and quality-control program at each facility that is adequate and appropriate to ensure "accuracy of interpretation of mammograms" and include "a requirement that mammograms be interpreted by a physician who is certified as qualified to interpret radiological procedures, including mammography . . . and who meets training and continuing medical education requirements as established by the secretary." 42 U.S.C. § 263(f)(1)(D).
The regulations implementing the MQSA are found at 21 C.F.R. § 900.1 et seq. Subsection (u) of 21 C.F.R. § 900.2 states that "[i]nterpreting physician means a licensed physician who interprets mammograms and who meets the requirements set forth in § 900.12(a)(1)." That regulation, in turn, establishes numerous demanding qualifications a physician must meet in order to be eligible under the MQSA to interpret mammograms, including extensive requirements for continuing clinical experience and education. As Holcomb forthrightly acknowledges in his brief to this Court, under the MQSA, "facilities are required to have their interpreting physicians earn and maintain continuing education credits related to mammography, and review a minimum amount of mammograms over a 24-month period." (Holcomb's brief, pp. 29-30.)
*1026 By the time of the earliest occurrence of the alleged breach of the standard of care by any of the defendant radiologists, June 30, 1997, Dr. Dockray had long since become disqualified from interpreting mammograms as an "interpreting physician" under the MQSA. He did not violate the MQSA after it became effective October 1, 1994, because he has not undertaken to interpret a mammogram for clinical purposes subsequent to that time. Thus, it was within the discretion accorded the trial court to conclude that Dr. Dockray's familiarity with the interpretation of mammograms had become sufficiently "stale" by June 1997, through inactivity, and certainly more so by the time Dr. Manzi conducted his single mammogram interpretation on June 3, 1999, that Dr. Dockray's testimony was properly excludable under Rule 702, Ala. R. Evid.
NABERS, C.J., and SEE, SMITH, and BOLIN, JJ., concur.
LYONS, Justice (concurring in part and dissenting in part).
I concur in affirming the summary judgment as to Dr. Robert P. Carraway. I must, however, respectfully dissent from affirming the summary judgments as to defendant radiologists, Dr. H. Chaney Aderholt, Dr. Randy Finley, and Dr. Steven Manzi.
Few areas of the law offer a more fertile field for turning simplicity into complexity than statutory construction. The main opinion is a classic example. The legislature responded to a perceived need to codify the bases upon which an expert witness would be permitted to testify in a medical-malpractice case by enacting § 6-5-548, Ala.Code 1975. So as to provide a complete perspective, I set forth the statute in its entirety:
"§ 6-5-548. Burden of proof; reasonable care as similarly situated health care provider; no evidence admitted of medical liability insurance.

"(a) In any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case.
"(b) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the health care provider whose breach of the standard of care is claimed to have created the cause of action is not certified by an appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself or herself out as a specialist, a `similarly situated health care provider' is one who meets all of the following qualifications:
"(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
"(2) Is trained and experienced in the same discipline or school of practice.
"(3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred.
"(c) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the health care provider whose breach of the standard of care is claimed to have created the cause of action is certified by an appropriate American board as a specialist, is trained and experienced in a medical *1027 specialty, and holds himself or herself out as a specialist, a `similarly situated health care provider' is one who meets all of the following requirements:
"(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
"(2) Is trained and experienced in the same specialty.
"(3) Is certified by an appropriate American board in the same specialty.
"(4) Has practiced in this specialty during the year preceding the date that the alleged breach of the standard of care occurred.
"(d) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, no evidence shall be admitted or received, whether of a substantive nature or for impeachment purposes, concerning the medical liability insurance, or medical insurance carrier, or any interest in an insurer that insures medical or other professional liability, of any witness presenting testimony as a `similarly situated health care provider' under the provisions of this section or of any defendant. The limits of liability insurance coverage available to a health care provider shall not be discoverable in any action for injury or damages or wrongful death, whether in contract or tort, against a health care provider for an alleged breach of the standard of care.
"(e) The purpose of this section is to establish a relative standard of care for health care providers. A health care provider may testify as an expert witness in any action for injury or damages against another health care provider based on a breach of the standard of care only if he or she is a `similarly situated health care provider' as defined above. It is the intent of the Legislature that in the event the defendant health care provider is certified by an appropriate American board or in a particular specialty and is practicing that specialty at the time of the alleged breach of the standard of care, a health care provider may testify as an expert witness with respect to an alleged breach of the standard of care in any action for injury, damages, or wrongful death against another health care provider only if he or she is certified by the same American board in the same specialty."
Section 6-5-548(a) imposes on a plaintiff in an action against a health-care provider the burden of establishing a breach of the standard of care. Under § 6-5-548(a) a plaintiff must prove by substantial evidence that the conduct of the accused health-care provider fell below the standard applicable to other similarly situated health-care providers in the same general line of practice in a like case. Subsections (b) and (c) of § 6-5-548 elaborate upon the phrase "similarly situated health care provider" appearing in § 6-5-548(a). Subsection (b) defines "similarly situated health care provider" for purposes of actions against health-care providers who are generalists as opposed to specialists. In such instance, the legislature has set forth three criterialicensure, training and experience in the relevant area of practice, and practice in that area within one year preceding the date of the alleged breach of the standard of care. Section 6-5-548(c) defines "similarly situated health-care provider" for purposes of actions against health-care providers who are specialists as opposed to generalists. In such instance, the legislature has set forth four criterialicensure, training and experience in the relevant specialty, certification in the relevant specialty, and practice in the relevant specialty during the year preceding *1028 the date of the alleged breach of the standard of care.
Section 6-5-548(d) deals with two subjects. First, it bans any evidence related to medical-liability insurance of any witness testifying as a similarly situated health-care provider. Second, it prevents discovery of the limits of insurance in an action against a health-care provider.
Section 6-5-548(e) is a statement of the legislative purpose of creating a relative standard of care with respect to actions against health-care providers. It then provides that a health-care provider may testify against another health-care provider only if he or she is a "similarly situated health care provider" as defined in the applicable subsection of the statute, depending upon whether the accused health-care provider is as generalist or a specialist.
I quote the statute verbatim and then summarize its provisions to show how a rather straightforward enactment of the legislature has been distorted by the main opinion's strained interpretation of various provisions of that enactment. Subsections (b) and (c) of § 6-5-548, with their definitions of "similarly situated health care provider," depending on whether the accused health-care provider is a generalist or a specialist, each begin with the following introductory phrase: "Notwithstanding any provision of the Alabama Rules of Evidence to the contrary." In plain English, this introductory phrase appears to the average reader to be a statement from the legislature requiring that, regardless of whatever the Alabama Rules of Evidence might provide, this is the standard the legislature wishes to employ. However, the main opinion has effectively revised that phrase to read as follows: "Notwithstanding any provision of the Alabama Rules of Evidence expressing a less stringent standard." Of course, it is beyond the prerogative of this Court to rewrite statutes to reach a result that it might deem to be more satisfactory than the one reached by applying the statute as written by the legislature. As we have stated in numerous cases, "this Court is not at liberty to rewrite statutes or to substitute its judgment for that of the Legislature." Ex parte Carlton, 867 So.2d 332, 338 (Ala. 2003). See also, e.g., Ex parte National Western Life Ins. Co., 899 So.2d 218, 226-27 (Ala.2004); Wal-Mart Stores, Inc. v. Patterson, 816 So.2d 1, 6 (Ala.2001); and Omni Ins. Co. v. Foreman, 802 So.2d 195, 199 (Ala.2001).
Next, the main opinion parses § 6-5-548 for instances where the word "shall" appears and then uses the presence of that word as the basis to distort the plain meaning of the word "may" as that word appears twice in § 6-5-548(e), which provides: "A health care provider may testify as an expert witness . . . only if he or she is a `similarly situated health care provider' as defined above." In plain English, this sentence appears to the average reader to be a statement from the legislature that a health-care provider is permitted to testify as an expert only if he or she is a similarly situated health-care provider as defined in either subsection (b) or (c) of § 6-5-548. Nevertheless, the main opinion treats "may" as vesting in the trial court discretion to go beyond the definition of a similarly situated health-care provider as provided in subsection (b) or (c) of § 6-5-548. Had the legislature used "shall," instead of "may," the main opinion states, it would have deprived the trial court of the right to disallow merely cumulative testimony.
Under the circumstances here presented, construing an act of the legislature addressing the problem of establishing criteria for expert witnesses in medical-malpractice actions against health-care providers, *1029 I consider the word "may" to be the equivalent of "is permitted." This interpretation of "may" as interchangeable with "is permitted" is not without substantial foundation. See Black's Law Dictionary 1000 (8th ed.2004), where the first definition of "may" is "[t]o be permitted to may close>." Following the reasoning of the main opinion, one would have to conclude that a statute providing that "the plaintiff may close" should be construed as saying that the trial court has discretion in refusing to permit the plaintiff to close, as opposed to merely acknowledging that the plaintiff has the right or is permitted to close. I could go on with numerous references to dictionaries other than legal dictionaries. The following from the Merriam-Webster Online Dictionary[19] is representative: "May . . . have permission to : be free to may sprawlC.E. Silberman>used nearly interchangeably with can." (Emphasis added.) I agree with the main opinion that "may" is permissive, but the permission is here granted by the legislature to the witness and not to the trial court so that it can add new criteria not set forth in the statute.
After studying Justice See's interesting analogies involving moisture content and baseball championships, I cannot resist the temptation to try to make my point through analogy. While we are handicapped in our construction of § 6-5-548 by the absence of a legislative history, perhaps the next best thing is a hypothetical fact situation involving a member of the legislature's requesting assistance in drafting a statute to address a perceived need. Suppose a member of the legislature asked the Legislative Reference Service to draft a statute that would deal with the member's concerns over excessively casual courtroom attire, by male attorneys by setting a standard for courtroom attire and stating a rule that emphasizes the importance of compliance with the new statute. A first draft of the legislation is prepared; it contains paragraph (a) stating that male attorneys appearing in court must be properly attired; paragraph (b) stating that notwithstanding any rule of etiquette to the contrary, suitable attire for a male attorney shall be a dark business suit and a white shirt; and paragraph (c) providing: "A lawyer shall appear in court if he is suitably attired as defined in paragraph (b)." When the member of the legislature is shown a copy of the proposed bill, the member makes the valid point that paragraph (c), as drafted, produces the absurd result that all attorneys who happened to show up for work wearing a dark business suit and white shirt would be required to appear in court, whether the attorney had business in court or not. So paragraph (c) is revised to read: "A lawyer may appear in court if he is suitably attired as defined in paragraph (b)." This version reaches the sensible result of permitting the person subject to the legislatively defined dress code to make the decision as to whether he will appear in court on a given day. The member studies the bill further and asks that the importance of compliance be emphasized. Paragraph (c) is again revised to read, "A lawyer may appear in court only if he is suitably attired as defined in paragraph (b)."
After the statute is enacted, attorney Hawkins[20] is denied admission to the courtroom because, although he is wearing a dark business suit and a white shirt, he is not wearing a necktie. In litigation over *1030 the propriety of excluding from the courtroom the attorney who wore no necktie, I assume that a majority of this Court would hold that the attorney had been properly excluded from the courtroom, based upon (1) rules of etiquette requiring a necktie, notwithstanding the plainly stated inapplicability of rules of etiquette in subparagraph (b), (2) the absence of the word "shall" and the use of the word "may" in paragraph (c), and (3) some special meaning drawn from the presence of the word "only" as the precursor to "if" in paragraph (c). And, I respectfully submit, that result would be just as inconsistent with the result called for by the plain language of the statute as is the result the majority reaches in this case.
Under the main opinion, simplicity has become complexitynotwithstanding the plain language of the statute. Under the main opinion, the Alabama Rules of Evidence have not been displaced in all respects; as the statute plainly requires, they are displaced only where necessary to promote stringency but not lenity. Finally, under the main opinion, § 6-5-548(e) does not give a witness permission to testify, even though he satisfies the criteria set forth in either subsections (b) and (c) of § 6-5-548, contrary to the plain meaning of the statute. I must respectfully dissent as to the defendant radiologists, Dr. H. Chaney Aderholt, Dr. Randy Finley, and Dr. Steven Manzi.
WOODALL and PARKER, JJ., concur.
NOTES
[1] Dr. Carraway testified that "spiculated edges" makes a doctor "think of cancer" or, alternatively, "it could represent fat necrosis where a breast has been hit, and then you get a lot of scar tissue, and both can mimic each other."
[2] A suggestion of death as to Carolyn Holcomb had been filed with the trial court on April 4, 2005.
[3] Dr. Murray Bern, Holcomb's proffered expert, did not take issue with the frequency with which Dr. Carraway ordered mammograms for Carolyn. Dr. Bern testified that he thought Dr. Carraway had been a careful and caring doctor leading up to the June 1998 examination and that after that point in time, he continued that same mode of care. The only complaint Dr. Bern had of Dr. Carraway's care was that Dr. Carraway did not perform a biopsy in June 1998.
[4] Dr. Bern testified that he has practiced medicine for almost 30 years, and he estimated that he has made the initial diagnosis of cancer in a patient "probably 10" times during those 30 years.
[5] At his deposition, Dr. Dockray reviewed films of Carolyn's June 30, 1997, mammogram and indicated what he described as "the [area] that begins to raise the index of suspicion." He identified June 1997 as the date the defendant radiologists first breached the applicable standard of care, rather than June 1998, the date identified in Holcomb's brief as the date of the first breach of the standard of care. He further testified that he believes anyone who participated in the reading of the radiographs from 1997 forward deviated from the applicable standard of care. Although Dr. Dockray appears to believe that the radiologists should have detected some problem in 1997, he later testified that the results of the June 1998 mammogram were "much changed" from Carolyn's previous films: "The spiculations, the stellate extensions of the lump, the lesion, the defect, were much easier to see, much more distinguishable than in previous studies." Despite this testimony, Dr. Dockray spent very little time during his deposition discussing the 1998 mammogram.
[6] Dr. Dockray, a board-certified radiologist, testified that he considers himself "semi-retired to his office since 1996 or '97," where he receives radiology films delivered via mail or computer from three medical facilities. Additionally, he has provided medical-legal consultations for the past three years. However, other than in connection with his legal consulting work, Dr. Dockray has not read a mammogram since 1994. Although the record is somewhat unclear on the matter, it also appears he has not performed a needle biopsy since at least 1994.
[7] Rule 702, Ala. R. Evid., provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
The Advisory Committee's Notes to Rule 702 state, in pertinent part:
"As under preexisting Alabama law, both questionswhether a witness is qualified as an expert and whether, if so qualified, that witness may give expert opinion testimony on the subject in questionare left largely to the discretion of the trial judge. Hagler v. Gilliland, 292 Ala. 262, 292 So.2d 647 (1974)."
[8] Section 6-5-548(d), Ala.Code 1975, addresses evidence of insurance coverage; it does not address the issue of expert testimony.
[9] Ala.Code 1975, § 6-5-548(a), states:

"(a) In any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case."
[10] Ala.Code 1975, § 6-5-548(b) and (c), state:

"(b) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the health care provider whose breach of the standard of care is claimed to have created the cause of action is not certified by an appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself or herself out as a specialist, a `similarly situated health care provider' is one who meets all of the following qualifications:
"(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
"(2) Is trained and experienced in the same discipline or school of practice.
"(3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred.
"(c) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the health care provider whose breach of the standard of care is claimed to have created the cause of action is certified by an appropriate American board as a specialist, is trained and experienced in a medical specialty, and holds himself or herself out as a specialist, a `similarly situated health care provider' is one who meets all of the following requirements:
"(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
"(2) Is trained and experienced in the same specialty.
"(3) Is certified by an appropriate American board in the same specialty.
"(4) Has practiced in this specialty during the year preceding the date that the alleged breach of the standard of care occurred."
[11] The significance of the words "[n]otwithstanding any provision of the Alabama Rules of Evidence to the contrary" in paragraphs (b) and (c) is that, in determining who is a "similarly situated health care provider," we do not look to the Alabama Rules of Evidence, but solely to the criteria listed in paragraphs (b) and (c).
[12] Section 6-5-548(d), Ala.Code 1975, is irrelevant to the issue raised on appeal. It prohibits in any medical-malpractice action for breaching the standard of care (1) the admission of evidence concerning medical insurance, and (2) the discovery of medical-insurance coverage limits.

Section 6-5-548(e), Ala.Code 1975, reads in full as follows:
"(e) The purpose of this section is to establish a relative standard of care for health care providers. A health care provider may testify as an expert witness in any action for injury or damages against another health care provider based on a breach of the standard of care only if he or she is a `similarly situated health care provider' as defined above. It is the intent of the Legislature that in the event the defendant health care provider is certified by an appropriate American board or in a particular specialty and is practicing that specialty at the time of the alleged breach of the standard of care, a health care provider may testify as an expert witness with respect to an alleged breach of the standard of care in any action for injury, damages, or wrongful death against another health care provider only if he or she is certified by the same American board in the same specialty."
[13] That is, meeting the moisture-content condition may not be sufficient.
[14] That is, meeting the win condition may not be sufficient.
[15] For example, one can buy milk from the corner grocery today "only if" one gets there by 9:00 p.m. It is a necessary condition that one get to the store by 9:00 p.m.; however, in addition to getting there by 9, the grocery must have received its shipment and not sold out of the milk, and the purchaser must also pay the price of the milk.

A condition may be both necessary and sufficient. That is, there may be one and only one way to produce a particular result. In that case, the language used is "if and only if." It is the seventh game of the World Series and the team will be world champions if and only if it wins this game.
[16] The phrase "[n]otwithstanding any provision of the Alabama Rules of Evidence to the contrary" that appears both in subsection (b) and in subsection (c) applies only to the definition of a "similarly situated health care provider." The phrase does not appear in subsection (e), which addresses whether the similarly situated health-care provider may testify as an expert witness.
[17] Rule 403, Ala. R. Evid., provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
[18] We might also ask whether Rule 615, Ala. R. Evid., which provides that "[a]t the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses," is abated with respect to expert witnesses who are similarly situated health-care providers. If the trial judge considered it to be in the interest of justice to exclude the expert witness from the courtroom during a particular witness's testimony, but the expert witness violated the trial court's order, would § 6-5-548(e), Ala.Code 1975, permit the expert witness to testify nonetheless? Additionally, Rule 606, Ala. R. Evid., provides that "[a] member of the jury may not testify as a witness before that jury in the trial of the case in which the juror is sitting." If a party calls one of the jurors to testify, and the juror is a similarly situated health-care provider, is the expert/juror permitted to testify notwithstanding Rule 606, Ala. R. Evid.?
[19] On the date this opinion was released the definition could be found at http://www.merriam-webster.com.
[20] I have shamelessly borrowed the subject of many stories told by the late Chief Justice Howell Heflin.