**REL: 09/30/2014**

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2014

————————————

## 1121181

————————————

**Ex parte Robert E. Anderson, M.D., and Selma Doctors Clinic, PC, d/b/a Selma Doctors Clinic**

### PETITION FOR WRIT OF MANDAMUS

**(In re: Barbara G. Craig, as administrator of the Estate of William James Craig, deceased**

**v.**

**Robert E. Anderson, M.D., and Selma Doctors Clinic, PC, d/b/a Selma Doctors Clinic)**

(Dallas Circuit Court, CV-09-900107)

MURDOCK, Justice.

1121181

Robert E. Anderson, M.D. ("Dr. Anderson"), and Selma Doctors Clinic, PC, d/b/a Selma Doctors Clinic ("SDC"),[1] petition this Court for a writ of mandamus directing the Dallas Circuit Court to vacate its order of May 27, 2013, granting plaintiff Barbara Craig's Rule 60(b), Ala. R. Civ. P., motion, and to reinstate the final judgment entered in favor of Dr. Anderson and SDC on October 24, 2012. We grant the petition and issue the writ.

## I.  Facts and Procedural History

This petition concerns a medical-malpractice/wrongful-death action filed by Barbara G. Craig ("Mrs. Craig") as the administrator of the estate of her husband William James Craig ("Mr. Craig"). On January 29, 2009, Dr. Anderson performed a left inguinal hernia repair on Mr. Craig ("the hernia surgery") at Vaughan Regional Medical Center ("VRMC"). On February 9, 2009, Mr. Craig was admitted to the intensive-care unit of VRMC suffering from extreme pain in his abdominal region.

_____

[1]Selma Doctors Clinic is Dr. Anderson's employer; it was sued solely on the basis of Dr. Anderson's alleged failures in providing proper medical care to William Craig.

2

1121181

On February 10, 2009, Dr. Anderson ordered a CT scan for Mr. Craig. Radiologist Dr. Robert Simpson interpreted the CT scan and concluded that it showed that Mr. Craig had a perforated duodenal ulcer.[2] According to medical records, Dr. Anderson performed surgery on Mr. Craig on February 10, 2009, to close the perforated ulcer ("the ulcer surgery"). Dr. Anderson's operation report[3] of the procedure provided the following relevant notations:

> "Under satisfactory general anesthesia the patient was propped and draped in sterile fashion. Upper midline incision was made and carried down through the skin and subcutaneous tissue. There was a lot of thin brownish material within the stomach which was removed with the suction. The duodenum was inspected and a large duodenal perforation could be seen. Several stitches were placed across the perforation in order to close it and then a portion of omentum was tacked down around and over the perforation to seal as a patch. The wound was then irrigated with copious amounts of saline. The

---

[2]There was no dispute at trial that the CT scan showed the existence of an ulcer.

[3]The operation report contains a printed date for the procedure of February 16, 2009. The printed date is struck through with a line and a handwritten "10" is above the printed "16." At trial, Dr. Anderson testified that he did not correct the date of the surgery in the report but that February 10, 2009, was the correct date. He also related that he initially dictated the operation report the day of the surgery but that the hospital's dictation system went down and he had to re-dictate it on February 16, 2009. Mrs. Craig did not dispute this testimony.

3

abdomen was closed with a running suture of 10 Vicryl, the fascia with interrupted sutures of #0 Vicryl, the subcutaneous tissue with #4-0 Vicryl, and the skin with staples.... I should mention that there were a lot of peritoneal changes around the duodenum precluding any formal procedure other than simply patching the duodenal perforation ...."

Thus, according to the operation report, Dr. Anderson used "Vicryl" sutures to close the abdomen, but the report did not detail the type of sutures he used to close the duodenal perforation or to patch the area with the omentum. It is undisputed that Vicryl sutures are absorbable and dissolvable in the body.

On February 13, 2009, Mr. Craig died while he was still a patient at VRMC.

On February 14, 2009, Mrs. Craig hired Dr. Boris Datnow, a semiretired pathologist, to perform a private autopsy on Mr. Craig to determine the cause of his death. Dr. Datnow determined the cause of death to be "acute purulent peritonitis and purulent ascites following an elective inguinal hernia repair." In layman's terms, Dr. Datnow concluded that Mr. Craig died of an infection he contracted after the hernia surgery. In his autopsy report, dated February 14, 2009, Dr. Datnow noted that he observed the

4

healed surgical incision from the hernia surgery. He also noted that "[t]here is an upper abdominal central vertical surgical incision with staples 5.5 inches in length." The latter notation is consistent with a second surgery having been performed on Mr. Craig; however, Dr. Datnow expressly noted in the report that "[a]n ulcer cannot be found."

In his deposition taken on May 31, 2011, Dr. Datnow explained that when he performed the autopsy on February 14, 2009, he did not have Mr. Craig's medical records, and he therefore was not aware of the reason for the second surgery. Subsequently, Mr. Craig's medical records were forwarded to Dr. Datnow and he gleaned from them that the purpose of the second surgery was to repair a perforated duodenal ulcer. Because he had not located an ulcer in the autopsy of February 14, 2009 ("the first autopsy"), Mrs. Craig's counsel asked Dr. Datnow in May 2009 to perform a second autopsy, paying particular attention to the region where the ulcer would be located ("the second autopsy"). Dr. Datnow performed the second autopsy solely on the gastrointestinal tract in order to see if he could find the ulcer and evidence of the

repair.[4]  In an undated addendum to his first autopsy report, Dr. Datnow stated that "[t]he operative site in and around the duodenum is soft and friable and a dissection[] in this area is difficult with the tissue breaking apart and crumbling. The operative site thus cannot be studied and described."  In his deposition, Dr. Datnow confirmed that "[w]hen I went back to look at it, I did not actually see an ulcer, but the tissue at this stage was kind of friable and a bit distorted.  So I could not verify the absence thereof or the presence [of an ulcer]."

   Dr. Datnow also stated in his deposition that during both autopsies he found no trace of sutures in the area where the ulcer surgery occurred. He explained that if silk sutures were used, they would have been present in the body for "many, many years" but that other types of sutures could have dissolved in the few days between the ulcer surgery and the first autopsy. Dr. Datnow further stated that during the second autopsy the condition of the tissue was such that he could not rule in or out whether Mr. Craig had an ulcer and whether there had been

_____

   [4]Dr. Datnow stated in his deposition that he had kept Mr. Craig's organs in jars in his garage, which is why he was able to reexamine the area in question.

an ulcer repair.[5] Specifically, Dr. Datnow testified that the tissue was so friable that the sutures could have become obscured, but "I certainly had no evidence of a suture I could pick and say, ah ... this is a suture." In both his report and his deposition testimony, Dr. Datnow stated that his findings pertaining to the presence or lack of an ulcer did not change his conclusion as to the cause of Mr. Craig's death.

On July 10, 2009, Mrs. Craig sued Dr. Anderson, SDC, and VRMC in the Dallas Circuit Court, alleging that the defendants were negligent in their care and treatment of Mr. Craig and that their conduct proximately caused his death. Specifically with regard to Dr. Anderson, the complaint alleged that he negligently/wantonly "nipped" Mr. Craig's colon while performing the hernia surgery; that he failed to timely

---

[5]In his deposition, Dr. Datnow was asked:

"So, as we move forward, then, we do so on the presumption and your acceptance of the fact that these medical records describe the presence of a duodenal ulcer and a surgical procedure by which it was repaired, even though the condition of the tissue did not permit you to verify that at autopsy; is that fair?"

Dr. Datnow responded: "I would say that is fair."

diagnose and seriously treat Mr. Craig's intra-abdominal condition; that he failed at various times to perform full examinations of Mr. Craig, which led to a failure to discover the severity of Mr. Craig's condition; that he failed to admit Mr. Craig to the hospital in a timely fashion so that he could receive proper care; and that, "[o]n the night of the operation to repair the duodenal ulcer (02/10/2009), Dr. Anderson negligently or wantonly failed to broaden Mr. Craig's antibiotic coverage in light of a grossly contaminated abdominal cavity and worsening infection .... This failure directly contributed to Mr. Craig's ongoing sepsis and ultimate death." The last claim constituted the only claim in the original complaint mentioning the ulcer surgery.

On November 15, 2010, Mrs. Craig filed her first amended complaint. The amended complaint contained more detailed allegations against the defendants, but the claims still centered on the defendants' failures in diagnosis, care, and treatment of Mr. Craig's intra-abdominal infection. The amended complaint did not make a claim against Dr. Anderson for failure to repair the duodenal ulcer. Instead, it faulted him for allegedly failing to perform a "thorough examination

of the entire abdominal cavity" during that surgery. In this regard, the amended complaint stated:

> "It is incumbent upon the operating surgeon to explore the entire abdomen to rule out other pathology as well as diminish the amount of contamination. There is no evidence that Dr. Anderson made any effort to significantly lower the infection burden through debridement of the contamination present within the abdomen. And, most egregious is the fact that the 13 cm fluid collection seen in the cul-de-sac on CT, and noted by the radiologist to be pathologic was not addressed. There is absolutely no justification not to explore this area and drain this collection that more likely than not arose from the alleged perforated ulcer and was infected. By not draining that collection, Dr. Anderson performed an incomplete exploration that left an undrained collection within Mr. Craig's abdomen. This failure to perform a complete operation was a breach of the standard of care and this breach contributed to the worsening of the emergent condition (sepsis) of Mr. Craig and probably and proximately caused his subsequent wrongful death."

The defendants answered Mrs. Craig's complaints, and discovery commenced. In the course of discovery, VRMC provided Mrs. Craig with a hospital bill for the ulcer surgery that reflected the use of three different types of sutures in that surgery. Mrs. Craig's standard-of-care expert, Dr. Carlton Young, was deposed on April 8, 2011. In his deposition, Dr. Young criticized Dr. Anderson for a delay in the diagnosis and treatment of a perforated ulcer with an

intra-abdominal infection. Dr. Young did not state or imply that the ulcer surgery did not occur, nor did he criticize Dr. Anderson's actions during the ulcer surgery. Dr. Young confirmed that the CT scan of February 10, 2009, showed that Mr. Craig had a perforated ulcer.

Dr. Anderson was deposed on August 31, 2010. Concerning the ulcer surgery, Dr. Anderson testified in his deposition as follows in response to questions posed by Mrs. Craig's counsel:

> "Q. What changes in Mr. Craig's care did you institute after seeing the CT results?
>
> "A. We needed to patch his ulcer or fix his ulcer and irrigate his abdomen.
>
> "Q. So you performed another operation; correct?
>
> "A. Correct.
>
> "....
>
> "Q. What did the CT show?
>
> "....
>
> "A. It showed a perforated ulcer.
>
> "Q. All right. And is that what was causing the fluid in the cul-de-sac to accumulate?
>
> "A. (Witness nods head.)

1121181

"Q. And so at about 19:33, you performed a surgery on Mr. Craig. What did you do?

"A. I opened his abdomen, removed fluid, found his perforated ulcer and patched it, put a couple of stitches across it and patched it with omentum. Then I irrigated with copious amounts of saline his right upper quadrant, his left upper quadrant, above his liver, below his liver, both lower quadrants, his cul-de-sac. All the fluid was removed from his abdomen. ...

"....

"Q. Did you close the wound?

"A. Yes."

Dr. Anderson was not asked in the deposition what kind of sutures he used during the surgery.

On November 10, 2011, VRMC filed a motion for a summary judgment.[6]  In the hearing on that motion, on May 17, 2012, Mrs. Craig's counsel argued as follows concerning the ulcer surgery:

"Mr. Gaiser [counsel for Mrs. Craig]: Yes sir.  To begin with, the man died of an infection.  He didn't die of anything else.  That's what he died of.  He died of sepsis.  There was an autopsy done by a pathologist, Mayo [Clinic] trained, board-certified pathologist.  He testified -- he testified on two trips through that autopsy that there was no surgery for a peptic ulcer.  Furthermore, if there was a

_____

[6]The trial court entered a summary judgment in favor of VRMC on June 6, 2012.

11

1121181

surgery for a peptic ulcer, he would have been so infected at the time that it would have spread the infection. But there was no evidence of a -- we are not doctors. We don't have the capacity to -- when I read that and saw no peptic ulcer in it from the autopsy after the client came in, we got the client right shortly after the death. So we were there fairly quickly. So I asked him to go ahead. I contacted him, asked him, I don't see anything here. He [Dr. Datnow] says, well, I am going to make another look.

"....

"Mr. Gaiser: The pathologist, he made another look. There were no sutures. You take fat, and you make a patch, and you sew it up. And there is no evidence that there was a hole or that there was a peptic ulcer. ... And by the way, the only evidence that exists at all about a peptic ulcer was from the anesthesiologist. Anesthesiologists are just -- they are doing their job independent of everyone else. It wasn't until after he [Mr. Craig] died on the [13th] that a tape recording thing that you make that they don't have any longer -- there is no evidence now. It was dictated by somebody. They wrote it out, and the report comes in and says that he took care of a peptic ulcer."

(Emphasis added.)

The trial of the case against Dr. Anderson and SDC was scheduled to begin on October 15, 2012, before Judge Thomas R. Jones. On October 8, 2012, Dr. Anderson and SDC filed a motion in limine in which they requested that the trial court preclude from trial, among other things,

12

"d) any argument or inference that Dr. Anderson did not perform a duodenal ulcer repair on the evening of February 10, 2009. While each medical witness, whether for the Plaintiff or Defendant, has conceded that such an operation was performed, counsel for the Plaintiff, Mr. Ron Gaiser, has, at times, and during oral argument, suggested that Dr. Anderson did not perform a surgical repair of the decedent's duodenal ulcer on the evening in question. Regardless, no such claim is pled, no medical witnesses proffered this opinion, and any such suggestion is without basis in fact."

The trial court heard arguments on the motion in limine on October 15, 2012, before the trial began. During the argument, the following exchange occurred:

"Mr. McCall [counsel for Dr. Anderson and SDC]: Now Your Honor focusing on (d) [of the motion in limine], the only time I've ever heard this and we heard it again a couple of minutes ago from Mr. Gaiser. And it's an argument or inference that there was no duodenal ulcer repair performed in this case. Dr. Anderson obviously performed a duodenal ulcer repair. [The ulcer] was diagnosed.

"The Court: What does Datnow's report say with regard to that? Did he say that he didn't find any evidence of it, or did he say in his report -- because I can't remember -- he didn't find any evidence of it or it was not done? What specifically did he write in his report?

Mr. Gaiser [counsel for Mrs. Craig]: Twice. The first time [Dr. Datnow] said that there was no duodenal ulcer in his original report. But I called him up. I said, you did an autopsy, and I told him what it was. And I said would you make another pass through. ... And he went back through it again. And again he couldn't find it. There was no hole

13

that he could find.  There was no hole that he could find.

"The Court:  Is that part of his report?

"Mr. McCall:  Your Honor, he says it couldn't be located.  The tissues were very friable.  He did not say no repair was done.  I don't think it provides Mr. Gaiser a platform to be allowed to argue that Dr. Anderson, the nursing personnel, et cetera, including the anesthesiologist, decided not to perform a repair on the evening in question.

"The Court:  It sounds to me like it's going to be a disputed fact.  And at least to the extent that his report says that he didn't find a repair, it will be up to you to convince this jury that it was merely not reported rather than not, that he did not perform it versus whether it was just not found.

"....

"The Court:  Well, you know, to the extent that you have two different versions and two different arguments, I am not going to prohibit the Plaintiffs from talking about what they believe to be the evidence.  Is Datnow going to be here to testify?

"Mr. Gaiser:  He is out of the state, but we have his deposition.

"The Court:  You are going to use his deposition?

"Mr. Gaiser:  Yes.

"The Court:  The evidence will be what it's going to be.

"Mr. McCall: Your Honor, I would like to add just one last thing for the record's sake, that it's certainly our position -- and while they had attempted to plead certain claims in reference to

what Dr. Anderson should or should not have done in reference to a particular surgery, they have never pled that he didn't perform the surgery. And they are trying to have it both ways.

"The Court: Well, you know, the evidence is what it is. The testimony is what it is. Whatever he may make in terms of an argument to this jury, if he misrepresents the evidence to this jury, I presume you are going to stand up and you are going to show Datnow's report and highlight his testimony and straighten the jury out on what your version of the facts are. So, you know, we are not going to change the evidence."

The trial took place over five days between October 15, 2012, and October 19, 2012. Dr. Anderson testified at trial that he surgically repaired Mr. Craig's perforated duodenal ulcer on February 10, 2009. In relevant part, Dr. Anderson testified as follows:

"Q. (By Mr. Johnston) [Mrs. Craig's counsel:] You did an operation on Mr. Craig on the evening of the 10th of February. What did you do? What did you repair?

"A. I opened his upper abdomen up, found his duodenal ulcer, sewed the ulcer up and put an omentum patch where you take the fat apron, and you just take a piece of it and put it over the ulcer and sew it down around it. And that's a patch. And that suffices to support the plug, the duodenal ulcer.

"....

"Q. (By Mr. Johnston) All right. So looking at your second entry, 2-11, is it 8:30?

15

"A.  That's correct.

"Q.  Which should be 2-10 according to you, what does your note read?

"A.  Pre and post-operative diagnosis.  That puts it on the 10th, perforated duodenal ulcer. Operation, exploratory left, meaning you open up somebody's abdomen and look and see what's going on, and suture and patch closure duodenal ulcer.  Under general anesthesia, estimated blood loss was less than a hundred cc's.

"....

"Q.  (By Mr. Johnston)  Was this a typical surgery that you performed on Mr. Craig?

"A.  A typical ulcer patch?

"Q.  That's what I mean.

"A.  Yes.

"Q.  And you say you went in and patched it with the omentum, and I think you described the procedure for us, correct?

"A.  Correct.

"Q.  And that involves sutures?

"A.  I sutured the wall of the ulcer back together and then put the patch on top of the small suture line, three stitches.

"Q.  So you sutured the hole, and then you sutured the patch?

"A.  Yes.

1121181

"Q. How much sutures did you use?

"A. I used about three on the ulcer, and probably five or six with the patch.

"....

"Q. (By Mr. Wright) [Dr. Anderson & SDC's counsel:] We can look at your operative note if we need to if you will step down please one more time, Dr. Anderson, and I want you to explain to these ladies and gentlemen using this illustration how you performed this operation?

"A. Well, we opened up the abdomen, made a small incision in the upper abdomen above the belly button. And then we exposed the stomach, and here's the ulcer that we had seen before. What we did was --

"Q. Let me stop you right there. When you say we, you have got the surgeon. You have got the anesthesiologist in there, a certified registered nurse anesthetist. You have got a scrub nurse and a circulating nurse. There's an OR team that has to be assembled; is that right?

"A. Yeah.

"Q. Who is doing the operation?

"A. I am doing the operation.

"Q. All right. Then tell me what you did?

"A. So what I did after finding the ulcer, put about three stitches across in order to close the hole. And then this is the fat apron that hangs off the stomach and colon.

"Q. What's that called?

17

"A. It's called the omentum. What we did after closing to insure better closure of this or protection of leak, what you do is pull the omentum up, and you tack it around the perforation. And that seals it, and that's just a second layer if you will.

Q. Y'all went through the substance of your operative note yesterday. So I'm not going to take us through every word of that, but I want to ask you. Are these procedures that you have described here, the identification of the ulcer, the closing it with the sutures, and I mean do you just pull those tight like somebody might sewing a piece of cloth, and that just closes up the hole?

"A. Yes.

"Q. And then you tie it off, and then you also described in your operative note this pulling up the omentum to form a patch; is that right?

"A. That's absolutely correct.

"....

Q. (By Mr. Johnston) [Mrs. Craig's counsel:] What kind of sutures did you use to repair the ulcer?

"A. Silk.

"Q. Silk. All right. How long do those take to dissolve in the body?

"A. They don't. They don't."

(Emphasis added.)

18

1121181

Dr. Young testified after Dr. Anderson. Following some preliminary questioning of Dr. Young pertaining to his experience and practice, Dr. Anderson and SDC's counsel argued that Dr. Young's area of expertise was too remote for him to testify as to the standard of care applicable to Dr. Anderson. In the course of that argument, the following exchange occurred between Mrs. Craig's counsel and the trial court:

> "Mr. Gaiser: To start with, there is no evidence, there will be -- when this is over with, there will be no evidence that there was a duodenal ulcer surgery. The reason is it is because the sutures would have been left behind.
>
> "The Court: Wait a minute, Mr. Gaiser. Go back over that again.
>
> "Mr. Gaiser: Okay. The last question we asked Dr. Anderson was, what kind of sutures did he use. He said silk. Silk sutures never dissolve. That's the reason I told Dr. Datnow to go back and make another look. And he looked, and he said unequivocally even the second time there was no hole. There was no repair. The sutures were not there. He said it twice.
>
> "The Court: Mr. Gaiser, are you seriously going to argue to this jury when we get there and if we get there that this was all a fabrication? Is that what you're arguing?
>
> "Mr. Gaiser: No sir. I'm not.
>
> "The Court: Are you going to tell this jury that this was not done?

19

"Mr. Gaiser: <u>What was done was a hernia surgery and it was a hernia surgery that killed the man, not the other surgery anyway.</u>

"The Court: That's not my question to you. Your comment to me was you thought there was no ulcer surgery. Are you telling me, Mr. Gaiser, that you're going to argue to this jury that there was no surgery done to this, to repair this man's ulcer?

"Mr. Gaiser: Sir, when we read the evidence from Dr. Datnow, he is going to testify that he could not find a duodenal ulcer. He could not find a duodenal ulcer. He had the whole body open on the table, and he could not find it. And I asked him what is this? It's crazy. How could this be? And he went back and did it again. He did it twice, and he could not find a hole. And he couldn't find the sutures. He couldn't find it. The operation and the record says it was performed on the 11th, not the 10th. He does his report on the --

"The Court: Got you. How about refocus to where we need to be, and that's with regard to Dr. Young's qualifications and the <u>Holcomb [v. Carraway</u>, 945 So. 2d 1009 (Ala. 2006),] case and the standards.

"....

"Mr. Gaiser: <u>Your Honor, he [Dr. Young] testified in his deposition that in his opinion he doesn't know of any fault that he [Dr. Anderson] did with respect to the duodenal ulcer.</u> I mean, I don't know what the argument is. If we hired all of the king's horses and all of the king's men, we wouldn't -- we wouldn't want to change our guy's testimony. <u>He has testified that he found no fault in it [the ulcer surgery].</u> They are arguing that he can't testify that there was no fault in it. That's amazing because he is not here to testify there was any fault in that. <u>Like I said, we don't even know that the evidence is going to show there was one.</u> ..."

20

1121181

(Emphasis added.)

At the conclusion of the argument excerpted above, the trial court decided to allow Dr. Young to continue testifying to the jury. As he did in his deposition, Dr. Young testified at trial that the CT scan "showed evidence of the perforation of the duodenal ulcer." Dr. Young stated that he would have ordered some tests sooner than did Dr. Anderson; however, he also admitted that he was not in the same general line of practice as Dr. Anderson. The following exchange also occurred between defendants' counsel and Dr. Young:

> "Q: So now in reflection, Dr. Young, and all of this, is it fair for me to characterize your testimony that while you have explained to us that had you been in this situation there are some things that you may have done differently at different times based on what has been suggested to you by what Mrs. Craig has said or what was suggested to you about the situation that existed in the hospital. But at the same time you recognize that even with all of that information, the care and treatment that Dr. Anderson provided to Mr. Craig was reasonable, appropriate and a course that is recognized to be within the standard of care for surgeons although you may have followed another course? Is that fair?

> "....

> "A. Given everything with the history that I have been privy to, yes.

21

1121181

"....

"Q. You are still firm that you want these people to understand you don't say this man committed malpractice, do you?

"A. Based on all of the information, I can't stand by that and say that, no.

"Q. You can't say that at all, can you?

"A. No."

Following the conclusion of Dr. Young's testimony, the trial court excused the jury for lunch and proceeded to discuss Dr. Young's testimony with Mrs. Craig's counsel.

"The Court: ... There is some concern about Dr. Young's testimony, especially in regard to his testimony as to [no breach of] the standard of care. And I think you know what I'm talking about Mr. Gaiser.

"Mr. Gaiser: Unfortunately. We think though that we can rehabilitate our case through Dr. Datnow, however.

"The Court: Well, sir, I fail to see how your causation expert, if he is allowed to testify, is going to be qualified to rehabilitate as to the standard of care.

"Mr. Gaiser: It's a fact. It will be a fact aspect, a fact. There's a particular fact that he would be able to testify to, that he has testified to on two occasions that when he did his pathology, when he did his, when he opened the body up and he looked at the organs and he looked at the cause of death, he determined that there was no -- there was an incision, and there was an operation done in the

22

peritoneal area and the -- excuse me, in the abdomen. And he did not find the sutures or whatever is necessary to determine that there was an operation to close an ulcer. If there was no operation to close an ulcer, then their entire defense in this case is flawed. And that's his sworn testimony. And then I asked him to do it again. I asked him. I said this, are you sure? I asked him. I called him up on the telephone. I said, are you sure? I asked him. I said, Dr. Datnow, this is a very important matter. Can you verify that. He said, I still have the organs. So he went out and verified it. And he said -- and Dr. Anderson testified that the sutures that were used were silk sutures. He testified that silk sutures would not decompose. ... I mean, either the sutures were there or they weren't there. If they weren't there, he didn't do the operation. ..."

(Emphasis added.)

Mrs. Craig was unable to call Dr. Datnow to testify because he was out of the country from October 2, 2012, to November 9, 2012. Instead, she sought to read Dr. Datnow's deposition to the jury. In response, Dr. Anderson and SDC objected that Mrs. Craig had failed to establish in the deposition that Dr. Datnow was a medical doctor at the time he performed the autopsies, and, therefore, they argued, Mrs. Craig had failed to qualify Dr. Datnow as a medical expert.

The following day, the trial court entertained motions from Dr. Anderson and SDC pertaining to Dr. Young's testimony and the qualifications of Dr. Datnow. In the course of the

23

argument on those motions, Dr. Anderson and SDC requested that the trial court enter a judgment as a matter of law in their favor because Mrs. Craig had failed to establish that Dr. Anderson had violated the applicable standard of care. At the conclusion of the parties' arguments on those motions, the trial court indicated that it would enter a judgment as a matter of law and that it would rule that Dr. Datnow "was not in fact properly qualified."

On October 24, 2012, the trial court entered an order that provided, in pertinent part:

> "The issue presented before the Court is with respect to defendants' oral motion to exclude the plaintiff's standard of care expert witness, Dr. Carlton Young. Dr. Young has testified that he is a board certified surgeon practicing at the University of Alabama at Birmingham, primarily as a transplant surgeon. Dr. Young has acknowledged to the Court that he does not accept 'on-call' responsibilities as a general surgeon at UAB. Dr. Young acknowledged to the Court that the sole issue which he has raised in criticism of the defendants is the issue of an alleged delay in the diagnosis and surgical treatment of a perforated duodenal ulcer and the postoperative care for a patient having undergone that surgical procedure.
>
> "Dr. Young has admitted to the Court that he has never performed this operation as a board certified surgeon. Moreover, Dr. Young has admitted that he is not in 'the same general line of practice' as the defendant, Dr. Anderson. This testimony is undisputed. Furthermore, Dr. Young has admitted in

24

his testimony that his board certification is issued by the administrative board of the American College of Surgeons, an organization that, among other things, has promulgated and adopted standards regarding the nature and degree of experience required of its members testifying as expert witnesses in matters such as this. In acknowledging that he has never performed the surgical procedure at issue in this case as a board certified surgeon, Dr. Young admits that his participation in this litigation is violative of the policy standards adopted by the American College of Surgeons which has issued his board certification. (This is but one factor considered by the Court in addition to those matters set forth herein above).

"The Court has held the defendants' motion under consideration and allowed Dr. Young to testify such that the Court could consider his testimony as a whole in ruling on defendants' motion.

"After consideration of Dr. Young's testimony in its entirety, having afforded the plaintiff opportunity to develop Dr. Young's testimony as fully as she could, the Court has determined that Dr. Young is not in the same general line of practice as the defendant, Dr. Anderson, and, as such, his testimony is due to be excluded.

"The Court notes that, aside from Dr. Young's concession that he does not practice in the same general line of practice as Dr. Anderson, the substance of Dr. Young's testimony (even if he were competent to testify as an expert in this cause) does not warrant submission of the plaintiff's case to the jury. Considering Dr. Young's substantive testimony in its entirety, the Court has observed that Dr. Young ultimately testified that all of the care and treatment provided by Dr. Anderson was in compliance with the standard of care, although Dr. Young stated that he personally would have done some things differently. Dr. Young stated unequivocally

25

that the defendant, Dr. Anderson, did not commit medical malpractice in providing care to plaintiff's decedent. Accordingly, Dr. Anderson and his employer, Selma Doctors Clinic, PC, are entitled to judgment as a matter of law.

"Following the testimony of Dr. Young, the plaintiff announced her intention to read the deposition of Dr. Boris Datnow. The parties concede that Dr. Datnow is a board certified pathologist and not a general surgeon. As such, Dr. Datnow is not a similarly situated health-care provider to Dr. Anderson under the terms and provisions of the Alabama Medical Liability Act, § 6-5-543(c), [Ala. Code 1975,] and his testimony is not, under any circumstances, admissible to establish a breach of the standard of care by Dr. Anderson. The parties also concede that the deposition transcript contains no testimony to the effect that Dr. Datnow was a licensed physician at the time that he allegedly performed a private autopsy on the body of plaintiff's decedent. The Court has determined that this is a necessary qualification which the plaintiff had the burden of establishing prior to eliciting his testimony from Dr. Datnow regarding the conclusions expressed in his autopsy report or opinion testimony which is based on the autopsy. Dr. Datnow's mere statement that he was a board certified pathologist on the date that his deposition was taken does not establish that he was a physician licensed to practice medicine and authorized under Alabama law to perform autopsy procedures at the time he allegedly performed the autopsy in question in this case, February 14, 2009. Accordingly, the Court has excluded the deposition of Dr. Datnow as inadmissible in this case.

"The Court having determined as a matter of law on the basis of undisputed testimony that Dr. Young is not in the same general line of practice as the defendant, Dr. Anderson, and, otherwise, having determined as a matter of law that the substantive

26

testimony of Dr. Young would completely absolve the defendants of any liability in this case, even if he were in the same general line of practice, hereby directs entry of judgment as a matter of law in favor of defendant Robert E. Anderson, MD, and Selma Doctors Clinic, PC, pursuant to Rule 50(a)(1)-(2) of the Alabama Rules of Civil Procedure. Plaintiff's claims against said defendants are hereby dismissed with prejudice."

On November 21, 2012, Mrs. Craig filed a Rule 59, Ala. R. Civ. P., motion to vacate the judgment or for a new trial. In the motion, Mrs. Craig contended that the trial court erred in excluding Dr. Young's testimony because

"it was not necessary for Dr. Young to have performed a surgical repair of a perforated duodenal ulcer in order for him to have been similarly situated. Dr. Young was not critical of the actual surgical repair of the duodenal ulcer performed by Dr. Anderson. Dr. Young was critical of the pre-surgical diagnosis and treatment and post-surgical diagnosis and treatment of Mr. Craig's intra-abdominal infection from which he suffered and died."

Mrs. Craig added that the standard of care in this action was that of a general surgeon and that Dr. Young is a board-certified general surgeon; thus, she asserted, he should have been deemed qualified to testify as to the applicable standard of care. Mrs. Craig also argued in the motion that the trial court erred by denying her "the right to access the original medical records of the decedent William James Craig that were

27

retained by Defendant Dr. Anderson." Mrs. Craig presented no other arguments in her Rule 59 motion. The trial court denied Mrs. Craig's Rule 59 motion on December 28, 2012.

In January 2013, Judge Collins Pettaway, Jr., succeeded Judge Jones in the Dallas Circuit Court.

On February 7, 2013, Mrs. Craig filed a motion pursuant to Rule 60(b)(3), Ala. R. Civ. P., in which she argued that Dr. Anderson had committed perjury and had perpetrated a fraud upon the trial court by testifying that he had performed the ulcer surgery when, in fact, he had not done so. Mrs. Craig noted that until Dr. Anderson testified at trial, the only indication of the kind of sutures Dr. Anderson had used in the ulcer surgery had been provided in Dr. Anderson's operation report, in which he stated that he had used Vicryl sutures, which dissolve within a few days of an operation. At trial, however, Dr. Anderson stated that in the ulcer surgery he used silk sutures, which do not dissolve. Mrs. Craig contended that this revelation at trial demonstrated that Dr. Anderson lied about performing the ulcer surgery. Mrs. Craig also accused defendants' counsel of participating in the fraud and that counsel's reason for doing so was that Dr. Anderson's

health-care-professional-liability policy allegedly contained an incentive for taking a malpractice action to trial rather than entering into a settlement with a plaintiff.

In support of her argument, Mrs. Craig submitted an affidavit from Dr. Datnow executed on January 8, 2013, in which he concluded:

> "I have again been contacted by Mr. Gaiser [Mrs. Craig's counsel] and he reported to me that Dr. Anderson testified during the June 2012 trial of this matter that he used 8 or 9 silk sutures (3 sutures on the ulcer and 5-6 sutures on the patch) to repair Mr. Craig's perforated ulcer, and that the silk sutures he used do NOT dissolve. Based upon Dr. Anderson's testimony at trial, I can say with absolute certainty that my initial finding that Mr. Craig had no ulcer as stated in my February 14, 2009, Autopsy Report was correct, and I can further state with absolute certainty that I saw no gross evidence of pathology that a duodenal ulcer repair was performed by Dr. Anderson in February 2009, for if such a surgery had been performed, I would have discovered the non-absorbable silk sutures during both [the first] autopsy and my reexamination of Mr. Craig's organs in May 2009.

> "In conclusion, based upon Dr. Anderson's trial testimony, I am absolutely certain that Dr. Anderson did not perform a perforated duodenal ulcer repair during the February 10, 2009, exploratory/surgical laparotomy on Mr. Craig, and any testimony to the contrary would be untrue."

(Some emphasis added.)

29

1121181

In opposing Mrs. Craig's Rule 60(b) motion, Dr. Anderson and SDC primarily contended that the Rule 60(b) motion actually constituted a second Rule 59 motion because all the information contained in the Rule 60(b) motion was known to Mrs. Craig at the time she filed her Rule 59 motion, and yet it was not presented in her Rule 59 motion. Dr. Anderson and SDC also argued that Dr. Anderson's statement in his operation report and his testimony at trial were not necessarily contradictory because his operation report had stated only the type of sutures he had used to close the abdomen, but the report did not detail the type of sutures he had used to close the duodenal perforation or to patch the area with the omentum. He also noted that hospital records showed that there were charges for three types of sutures used in the surgery. Thus, the evidence indicated that Dr. Anderson may have used both Vicryl sutures and silk sutures in the ulcer operation. Dr. Anderson and SDC also asked Judge Pettaway to strike Dr. Datnow's affidavit on the ground that the assertions therein could have been stated within the time limits for filing a Rule 59 motion but Mrs. Craig failed to take the steps necessary to make that happen.

On February 8, 2013, Mrs. Craig filed a notice of appeal of the trial court's October 24, 2012, judgment in favor of Dr. Anderson and SDC.[7]  Craig v. Anderson (No. 1120649, June 6, 2013).[8]

On April 18, 2013, Judge Pettaway heard arguments on Mrs. Craig's Rule 60(b) motion.  In the hearing on the Rule 60(b) motion, Mrs. Craig's counsel, seeking to clarify her fraud argument, stated:  "One last thing.  We've never said the man didn't have an ulcer.  We said the man never had an ulcer operation.  And there's a good reason for that because the man was so infected, you could not have operated."  Mrs. Craig's counsel also abandoned his contention that defendants' counsel participated in the alleged fraud.

On May 27, 2013, Judge Pettaway entered an order granting Mrs. Craig's Rule 60(b)(3) motion.  The order recited some of the facts related above, including Dr. Anderson's testimony at trial pertaining to the type of sutures he had used during the

---

[7]Mrs. Craig's notice of appeal did not deprive the trial court of jurisdiction to hear her Rule 60(b) motion.  See Rule 60(b), Ala. R. Civ. P.; Harville v. Harville, 568 So. 2d 1239, 1240 (Ala. Civ. App. 1990).

[8]The appeal in case no. 1120649 was dismissed on Mrs. Craig's motion on June 6, 2013.

ulcer surgery. Judge Pettaway concluded that "Defendant Anderson's February 16th Operative Report was a forged and fraudulent medical record" because of the crossed-out date of February 16, 2009, for the surgery date and because Dr. Anderson admitted the report was dictated three days after Mr. Craig's death. The order contained the following additional conclusions:

> "(1) Plaintiff's fraud claims are properly raised under Ala. R. Civ. P. 60(b)(3).
>
> "(2) There is clear and convincing evidence that Defendant Anderson did not perform a perforated duodenal ulcer repair on decedent Mr. Craig and thus he engaged in fraud, misrepresentation, and deceit.
>
> "(3) Defendant Anderson committed fraud in procuring the Court's October 24, 2012, Order of Judgment.
>
> "(4) The fraud committed by Defendant Anderson was both intrinsic and extrinsic in nature in that (1) it occurred during the trial of this matter and was accompanied by perjury. Defendant Anderson's use of false and/or forged medical records, and his misrepresentation of evidence pertaining to his having performed a perforated duodenal ulcer repair such that it affected tho Court's determination of tho issues presented therein; and (2) it was collateral to the issues tried in this mater such that this Court was deceived into believing that Defendant Anderson performed a perforated duodenal ulcer repair when in fact he had not.
>
> "(5) Defendant Anderson misled this Honorable Court and in so doing both this Court and Defendant

1121181

Anderson prevented Plaintiff Craig from fully and fairly presenting her case.

"(6) The fraud committed by Defendant Anderson has resulted in a judgment whose integrity is lacking, and absent relief an extreme and unexpected hardship will result.

"(7) The fraud committed by Defendant Anderson was not obtainable by the due diligence of Plaintiff prior to the time of entry of the Court's Order of Judgment nor prior to or during the pendency of Plaintiff's Ala. R. Civ. P. 59 motion.

"(8) Plaintiff currently has an appeal pending before the Supreme Court of Alabama and, thus, Plaintiff's Ala. R. Civ. P. 60(b)(3) motion is not a substitute for an appeal and does not subvert the principle of finality of judgments.

"The Court further states that the circumstances of this case are precisely the type of extraordinary circumstances provided for under Ala. R. Civ. P. 60(b)(3) for which the extreme remedy of relief from a final judgment is permitted. As such, Plaintiff's Ala. R. Civ. P. 60(b)(3) Motion to Set Aside the Court's October 24, 2012, Final Order of Judgment is hereby granted.

"Furthermore, Defendants' Motion to Strike the Affidavit of Dr. Boris Datnow is hereby denied. As set forth above, this Court finds that Plaintiff's 'lack of surgery' argument is not fanciful nor baseless as suggested by Defendants but in fact is supported by clear and convincing evidence."

Dr. Anderson and SDC filed their petition for the writ of mandamus in this Court on July 8, 2013. The Court ordered answers and briefs on August 23, 2013.

33

## II. Standard of Review

"Relief from a judgment under Rule 60(b) is proper only where the moving party shows exceptional circumstances which justify relief. Grover v. Grover, 516 So. 2d 667 (Ala. Civ. App. 1987). A trial court has wide discretion to set aside a judgment which it deems invalid because of fraud practiced by a party in the procurement of the judgment. Reynolds v. Reynolds, 516 So. 2d 663 (Ala. Civ. App. 1987). Because the trial court possesses such wide discretion, its judgment will be affirmed on appeal unless there is an abuse of that discretion."

Smith v. Smith, 668 So. 2d 846, 848 (Ala. Civ. App. 1995). We also note, however, that "'the broad power granted by Rule 60(b) cannot be used to relieve a party from free, deliberate, and calculated choices.'" Wal-Mart Stores, Inc. v. Pitts, 900 So. 2d 1240, 1245 (Ala. Civ. App. 2004) (quoting State ex rel. Croson v. Croson, 724 So. 2d 36, 38 (Ala. Civ. App. 1998)).

## III. Analysis

Rule 60(b)(3) provides that "[o]n motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for ... fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other

1121181

misconduct of an adverse party ...."  Rule 60(b)(3), Ala. R. Civ. P.

> "One who contends that an adverse party has obtained a verdict through fraud, misrepresentation, or other misconduct (Rule 60(b)(3)) must prove by 'clear and convincing evidence (1) that the adverse party engaged in fraud or other misconduct and (2) that this misconduct prevented the moving party from fully and fairly presenting his case. [Citation omitted.]  The resolution of these two issues is within the trial court's discretion, and on review, our only inquiry is whether the trial court abused its discretion.' Montgomery v. Hall, 592 F.2d 278, 279 (5th Cir. 1979).  See, also, Penn v. Irby, 496 So. 2d 751 (Ala. 1986)."

Pacifico v. Jackson, 562 So. 2d 174, 179 (Ala. 1990).

Mrs. Craig alleges that Dr. Anderson committed fraud by submitting documentation pertaining to, and testifying both in deposition and at trial that he performed, a repair of a perforated duodenal ulcer on Mr. Craig on February 10, 2009. It appears Mrs. Craig concedes that Dr. Anderson performed a surgery on her husband on that date because Mrs. Craig alleged in her amended complaint that Dr. Anderson failed to perform a thorough exploratory surgery and failed to thoroughly treat the infection in the abdomen during the surgery on February 10, 2009, and because Dr. Datnow stated in his autopsy report and testified in his deposition that he found

35

an abdominal incision for the second surgery performed on Mr. Craig. Mrs. Craig contends, however, that because Dr. Datnow did not find sutures in the abdominal area and because Dr. Anderson stated at trial that he used silk sutures during the ulcer surgery, which do not dissolve, it can only be concluded that Dr. Anderson did not perform the ulcer repair as he testified he did.[9]

Dr. Anderson and SDC argue that Judge Pettaway exceeded his discretion in granting Mrs. Craig's Rule 60(b) motion because, they say, Mrs. Craig failed to demonstrate that the alleged fraud prevented her from fully and fairly presenting

---

[9]It is less clear whether Mrs. Craig believes her husband had an ulcer. During the Rule 60(b) hearing, Mrs. Craig's counsel stated that Mrs. Craig had "never said [her husband] didn't have an ulcer," but before the Rule 60(b) hearing her counsel repeatedly stated in arguments to the trial court that Dr. Datnow never found an ulcer during his autopsy investigations. Indeed, in one exchange before the trial court concerning the fraud allegation, Mrs. Craig's counsel sought to explain away the results of the CT scan by comparing it to his own experience of once having been falsely diagnosed with cancer. Moreover, in her respondent brief Mrs. Craig questions whether the CT scan performed on Mr. Craig showed a perforated duodenal ulcer because the CT scan itself was not proffered as evidence; only the radiologist's report interpreting the CT scan was admitted. This observation ignores that Mrs. Craig did not question the radiologist's report at trial and that her own expert, Dr. Young, testified that the CT scan showed a perforated duodenal ulcer inside her husband.

her case.  In support of their argument, Dr. Anderson and SDC

quote Pacifico, which states, in relevant part:

> "On the broader public policy issue of reviewing post-trial claims of fraud, the United States Supreme Court, in [United States v.] Throckmorton, [98 U.S. [61,] 68-69 [(1878)], had this to say:
>
>> "'[T]he mischief of retrying every case in which the decree was rendered on false testimony by perjured witnesses, or on documents whose genuineness was in issue and which are afterward ascertained to be forged or fraudulent, would be greater, by reason of the endless nature of the strife, than any compensation arising from doing justice in individual cases.'
>
> "First National Life Ins. Co. v. Bell, 174 La. 692, 699, 141 So. 379, 381 (1932), is of interest in this connection:
>
>> "'If a judgment could be annulled on the showing made by plaintiff, litigation would be endless. Another judgment in favor of [defendant] could be annulled on allegations of newly discovered evidence, and so on to the end of time. If an unsuccessful litigant were permitted to attack a judgment as fraudulent on the ground that his opponent failed to disclose certain facts within his knowledge, which by the exercise of reasonable diligence the unsuccessful litigant could have ascertained for himself, there would be no finality to a judgment. In legal effect, it would be nothing more than an order to show cause why it should not be set aside.'
>
> "The same principle is stated, in different language, in the case of Porcelli v. Schlitz Brewing

37

Co., 78 F.R.D. 499, 501 (E.D. Wisc. 1978), as follows: '[Movant] must ... satisfy the Court that he has substantial evidence of fraud which was not obtainable by due diligence prior to the time of entry of the order.'

"One who contends that an adverse party has obtained a verdict through fraud, misrepresentation, or other misconduct (Rule 60(b)(3)) must prove by 'clear and convincing evidence (1) that the adverse party engaged in fraud or other misconduct and (2) that this misconduct prevented the moving party from fully and fairly presenting his case. ...'"

562 So. 2d at 179 (emphasis added).

Mrs. Craig dismisses Pacifico's statement concerning a due-diligence requirement for fraud claims under Rule 60(b)(3) by arguing that the Pacifico Court was not stating the law of Alabama, but rather the law in the United States District Court for the Eastern District of Wisconsin as it existed in 1978. Mrs. Craig contends that

"Defendants' 'due diligence' argument applies only to Ala. R. Civ. P. 60(b)(2) motions pertaining to newly discovered evidence. Plaintiff's motion is not based on newly discovered evidence. Plaintiff's motion is based upon fraud committed by Defendant Anderson that prevented Plaintiff from fully and fairly presenting her case and resulted in a judgment whose integrity is lacking, and absent relief an extreme and unexpected hardship will result, which is the type of fraud provided for in Rule 60(b)(3)."

38

Mrs. Craig fails to cite any authority for her proposition that due diligence applies only to claims under Rule 60(b)(2), Ala. R. Civ. P. Moreover, her characterization of Pacifico ignores the fact that the Pacifico Court quoted cases from two other courts for essentially the same proposition stated by the federal district court in Porcelli v. Schlitz Brewing Co., 78 F.R.D. 499 (E.D. Wis. 1978).

In any event, the principle at issue -- or at least its equivalent -- is embedded in the second element that was identified in Pacifico as required in order for a movant to succeed in a Rule 60(b)(3) motion: The movant "must prove 'by clear and convincing evidence ... that [the] misconduct prevented the moving party from fully and fairly presenting [her] case.'" 562 So. 2d at 179. As one federal district court[10] succinctly explained: "The case law has repeatedly emphasized that a party is not prevented from fully and fairly presenting its case if it had access to the information at issue." Halliburton Energy Servs., Inc. v. NL Indus., 618

---

[10]"Federal cases construing the Federal Rules of Civil Procedure are persuasive authority in construing the Alabama Rules of Civil Procedure, which were patterned after the Federal Rules of Civil Procedure." Hilb, Rogal & Hamilton Co. v. Beiersdoerfer, 989 So. 2d 1045, 1056 n.3 (Ala. 2007).

1121181

F. Supp. 2d 614, 641 (S.D. Tex. 2009). See also Tunnell v. Ford Motor Co., CIVA.4:03-CV-00074, June 26, 2006 (W.D. Va. 2006) (not reported in F. Supp. 2d) ("[T]he fact that Plaintiff was already aware of the essential information in the AML/Tyco documents speaks to the third prong of a Rule 60(b)(3) inquiry. Because eight months before trial Plaintiff already knew the crucial information regarding the BCO manufactured by Tyco and used by Aston Martin, Defendant's misconduct did not prevent Plaintiff from fully proving this aspect of his case."); Casey v. Albertson's Inc., 362 F.3d 1254, 1260 (9th Cir. 2004) (stating that "'[F]ederal Rule of Civil Procedure 60(b)(3) require[s] that fraud ... not be discoverable by due diligence before or during the proceedings'" (quoting Pacific & Arctic Ry. & Navigation Co. v. United Transp. Union, 952 F.2d 1144, 1148 (9th Cir. 1991)); Taylor v. Texgas Corp., 831 F.2d 255, 260 (11th Cir. 1987) (noting that "given the fact that Texgas itself knew that it had been making pension payments to Taylor, even if its counsel were not aware of that fact, Texgas cannot show that Taylor's failure to mention the pension payments prevented Texgas 'from fully and fairly presenting its case'" (quoting

Harre v. A.H. Robins Co., 750 F.2d 1501, 1503 (11th Cir. 1985))).

The rendition of the facts above makes clear that Mrs. Craig's counsel was aware long before trial of purportedly "crucial information" regarding the supposed lack of an actual duodenal repair. Indeed, he repeatedly expressed with certitude that there had been no such repair and that the evidence he possessed based on Dr. Datnow's two autopsies clearly established that "fact." The results of Dr. Datnow's first autopsy were known to Mrs. Craig two years and eight months before trial and the results of the second autopsy were known to her two years and five months before trial. Nonetheless, Mrs. Craig's counsel did not ask Dr. Anderson in his deposition, which was taken two years before trial, what kind of sutures he used in the ulcer surgery, nor did he attempt at any time during the ensuing two years to engage in any supplemental discovery aimed at obtaining this information from Dr. Anderson. When Dr. Anderson was asked at trial what kind of sutures he used in the ulcer surgery, Mrs. Craig's counsel did not follow up Dr. Anderson's answer with a question regarding any apparent discrepancy between the

statement in his operation report that he used Vicryl sutures and his statement at trial that he used silk sutures. Nor did he otherwise attempt to make use of this testimony in support of the claims before the court.[11]

Dr. Anderson's trial testimony that he used silk sutures to perform the duodenal repair is indeed additional evidence in support of Mrs. Craig's assertion that no such repair actually occurred. It is only that, however -- "additional" evidence of a "fact" already known by and allegedly provable by Mrs. Craig. Insofar as Dr. Anderson's testimony that he did perform the repair, this, of course, was nothing new. To allow Mrs. Craig to assert new claims based on either aspect of Dr. Anderson's trial testimony at this juncture would be to allow her to piecemeal her claims and, indeed, to use Rule 60(b) to avoid the"'free, deliberate, and calculated choices'" made by her in the management and presentation of her action.

---

[11]Even if the possibility of a lack of an actual duodenal repair had not been known to Mrs. Craig until trial, she failed to express to the trial court, and has not even articulated in her brief to this Court, a cogent explanation or factual theory as to how the failure to actually perform a duodenal repair would support or otherwise relate to some other, pleaded failure on the part of Dr. Anderson that caused Craig's death. See Ala. Code 1975, § 6-5-551.

See <u>Wal-Mart Stores</u>, 900 So. 2d at 1245 (quoting <u>Croson</u>, 724 So. 2d at 38).

Further, despite the fact that Mrs. Craig never pleaded her "fake surgery" allegation in her complaints,[12] the trial court was willing to allow Mrs. Craig's counsel to present Dr. Datnow's deposition to the jury, concluding that the issue was a "disputed fact." The only reason Mrs. Craig was prevented from presenting Dr. Datnow's deposition was a failure to qualify him as an expert, a ruling that Mrs. Craig did not challenge in her Rule 59 motion.

---

[12]This failure of pleading, alone, is fatal to any attempt by Mrs. Craig to assert the supposed lack of a duodenal repair as an act of malpractice in and of itself. Section 6-5-551, Ala. Code 1975, of the Alabama Medical Liability Act plainly requires that "[t]he plaintiff shall amend his complaint timely upon ascertainment of new or different acts or omissions upon which his claim is based; provided, however, that any such amendment must be made at least 90 days before trial." Despite purported foreknowledge of the alleged lack of any duodenal repair, Mrs. Craig failed to assert a claim in this regard or to incorporate any allegation of this "fact" into any amended claim. Allowing her to use a Rule 60(b) motion to do so now would sanction the piecemealing of claims into separate lawsuits and allow her to use a Rule 60(b) motion to achieve "'relie[f] ... from free, deliberate, and calculated choices'" made by her in the management and presentation of her lawsuit. <u>Wal-Mart Stores</u>, 900 So. 2d at 1245 (quoting <u>Croson</u>, 724 So. 2d at 38).

In addition, the trial court entered its judgment on October 24, 2012. By Mrs. Craig's own admission, Dr. Datnow returned from his absence on November 9, 2012. Mrs. Craig filed her Rule 59 motion on November 21, 2012. Mrs. Craig could have presented her fraud argument and affidavit from Dr. Datnow in her Rule 59 motion, and yet she did not do so. Instead, she waited another month and a half -- and after a new trial judge had succeeded Judge Jones -- to present the argument and affidavit in her Rule 60(b) motion.

The foregoing facts demonstrate that even if Dr. Anderson's trial testimony concerning the ulcer surgery could be considered fraudulent, Mrs. Craig was not prevented as a result of that fraud from fully and fairly presenting her allegation of a fake surgery. Instead, she deliberately waited to present the argument in her Rule 60(b) motion. Indeed, in her brief Mrs. Craig does not deny that she could have presented the argument sooner, at least in her Rule 59 motion. She simply contends that she did not have to do so because she filed her Rule 60(b) motion within the four-month period prescribed in Rule 60(b) as the outer limit for the filing of motions under Rule 60 (b)(1)-(3). Under the

circumstances presented in this case, however, the fact that Mrs. Craig filed a Rule 60(b)(3) motion within that four-month period does not excuse her failure to present her fraud argument sooner. Once again, "'the broad power granted by Rule 60(b) cannot be used to relieve a party from free, deliberate, and calculated choices.'" Wal-Mart Stores, 900 So. 2d at 1245 (quoting Croson, 724 So. 2d at 38).

Mrs. Craig has failed to demonstrate how the alleged fraud prevented her from fully and fairly presenting her claims at trial or in a posttrial Rule 59 motion. Mrs. Craig's counsel repeatedly asserted that Mr. Craig did not die as a result of the performance by Dr. Anderson of an ulcer surgery or the lack thereof. Instead, Mrs. Craig's theory of the case was that Mr. Craig died of an intra-abdominal infection acquired after the hernia surgery and that Dr. Anderson was responsible for Mr. Craig's death because he failed to timely diagnose and treat the infection. Mrs. Craig's case did not fail as the result of any statement by Dr. Anderson pertaining to the ulcer surgery. It failed because of a lack of proof of the claims asserted.

1121181

## IV. Conclusion

Based on the foregoing, we conclude that the trial court exceeded its discretion in granting Mrs. Craig's Rule 60(b)(3) motion setting aside the October 24, 2012, final order in favor of Dr. Anderson and SDC. Therefore, we grant Dr. Anderson and SDC's petition for a writ of mandamus and direct the trial court to reinstate its final order of October 24, 2012.

PETITION GRANTED; WRIT ISSUED.

Stuart, Shaw, Main, Wise, and Bryan, JJ., concur.

Bolin and Parker, JJ., concur in the result.

Moore, C.J., dissents.